Revised July 13, 1999

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————

No. 97-40365

———————————

JOHN BARTLEY; MIKE RUCKER; CHRIS LUKER;
WALTER HENRY; TIM HUMBER,

Plaintiffs-Appellees
Cross-Appellants,

PLANET INSURANCE COMPANY,

Intervenor Plaintiff-
Appellee,

versus

EUCLID, INC., ET AL.,

Defendants,

EUCLID, INC.,

Defendants-Intervenor Defendant
Appellant-Cross-Appellee.

——————————————————————————

Appeals from the United States District Court for
the Eastern District of Texas

——————————————————————————

June 25, 1999

Before REAVLEY, POLITZ, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ,
WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART,
PARKER and DENNIS, Circuit Judges.[*]

———————————

[*]Chief Judge King is recused and did not participate in this decision.

REAVLEY, Circuit Judge:

Five drivers of heavy equipment coal haulers sued the manufacturer for injuries caused by the unreasonably dangerous design of the haulers. Four drivers obtained verdicts and judgments. Three of these have now settled their claims. The manufacturer's appeal of the judgment for Chris Luker contends that the evidence of causation was insufficient, that expert testimony was improperly admitted, and that the claim was proscribed by limitations. Luker cross appeals the reduction of his damages on the finding of his contributory negligence. Mike Rucker appeals the denial of his claim on the finding of his contributory negligence. The en banc court has vacated the prior panel opinion[1] and now affirms the trial court judgment.

## Background

Euclid, Inc. (Euclid) manufactured the faulted vehicles with the engine under the cab, hence "short nosed." Our record of their use begins with an Australian mining company in 1977, when the company reported to the Australian seller that the drivers at the mine refused to operate the new short nosed hauler because of the roughness of its ride. Both the seller and the mining company engaged engineers to test the new hauler, and their engineers confirmed the complaints of the drivers and described the short nosed haulers as completely unacceptable. One of the engineers, who had himself designed vehicles and had testified for Euclid in Australian litigation, testified in this trial that he had never seen a vehicle with so rough a ride. One of the Australian drivers testified about his experience with both the "long nosed" hauler (*i.e.*, engine in front of cab) and the short nosed hauler, saying the latter "kicked up like a wild horse." The authorized

---

[1]*See Bartley v. Euclid, Inc.*, 158 F.3d 261 (5th Cir. 1998), *vacated*, 169 F.3d 215 (5th Cir. 1999).

2

dealer for Euclid products in Australia testified that they could not resolve the rough ride and attributed the problem to the general geometry and weight distribution of the short nosed haulers. Euclid sent its chief engineer to investigate, who found that the short nosed hauler rode four times worse than the long nosed version, vibrated even at low speeds, and demonstrated ride problems.

The short nosed haulers were returned to Euclid and put to use in Texas where they were operated by plaintiffs Luker and Rucker at Texas Utilities Mining Company (TUMCO). Two of the Australian engineers came to Texas and confirmed that the short nosed haulers there gave the same unacceptable vibration demonstrated earlier in Australia.

Plaintiff Luker testified that he worked for thirteen years at TUMCO. During that time, he operated the short nosed hauler almost exclusively. He testified that TUMCO required a physical examination before hiring him as a hauler driver, and despite his brief employment before that time doing construction and oil derrick work, his back was determined to be sound. Luker stated he had never ridden any coal hauler other than the short nosed version and had no basis to compare its ride to that of other coal haulers. He testified that various modifications made to the short nosed haulers did not improve the rough ride during the course of his employment and that his complaints about the ride quality to his supervisors and the authorized dealer were answered with assurances that nothing further could be done. He averred that the complaints of the Australian drivers describing the ride of the short nosed hauler were identical to his experience on the machine.

Plaintiff Rucker worked at TUMCO for ten years and began driving the coal haulers in early 1991. At the end of his employment, he had driven the coal haulers on a partial rotation for three and a quarter years. He testified that during his employment he had never driven any

3

equipment other than the short nosed coal haulers and, occasionally, the water trucks, end dumps, and a back hoe. He agreed with the other witnesses, both those from TUMCO and those from Australia, that the short nosed haulers' ride was punctuated by back slapping, loping, and vibration. He suffered the back pain that is related to his claim in 1994.

Dr. Samaratunga, a neurosurgeon, testified that he personally rode a short nosed hauler to see what force was experienced by the driver. He pointed out that the widespread damage to the spines of the drivers was unlike that of his other patients, where damage did not occur across all three regions of the spine. Samaratunga took the plaintiffs' histories, reviewed their medical records, and examined and treated them. He testified that plaintiff Luker might require surgery, and that the rough ride of the coal hauler was a contributing factor to the damage. He testified that plaintiff Rucker suffered injury to his middle and lower back and may require surgery as well as extensive physical therapy, but that he had the least amount of damage of the five plaintiffs.

Dr. Aprill, a radiologist, testified to the uncommon distribution of endplate fractures among the coal haulers' magnetic resonance imaging scans (MRIs) compared to other back patients who, like these hauler operators, smoked, were overweight, had suffered back trauma from accidents, and were the same age. He explained that the endplate is at the end of the vertebrae at the top and bottom of each disc. These cartilaginous plates fracture when a vertical load is applied to the disc and the disc presses against the endplate. Endplate cracks change the environment in the discs, leading to disc degeneration, which makes the disc vulnerable to compression injury. As such, fractured endplates are the hallmark of compression failure. He noted further that it is well known and supported by medical literature that whole body vibrations cause fracturing of the endplates. The more endplates that are cracked, the more discs will

4

degenerate, and the more likely it becomes that one or more of the degenerated discs will fail and produce back pain. Aprill then testified that the MRIs of the hauler operators evidenced the same fingerprint, *i.e.*, repeated vertical compression failure in both the dorsal and lumbar regions, a pattern not found in MRIs of non-hauler back pain patients. Specifically, Aprill testified that the MRIs of plaintiff Luker demonstrated multiple cracks in the endplates in the dorsal spine, and cracks and degenerative disease and disc herniation in the lumbar spine, which correlated with Luker's description of his pain symptoms in the dorsal and lumbar regions of his back. Similarly, the MRIs of plaintiff Rucker showed that he had suffered multiple endplate cracks in the dorsal spine and three abnormalities in the lumbar spine, which also correlated to his pain symptoms. Aprill identified this pattern in all five hauler drivers.

The jury found Luker's damages to be $900,000 and, with the assessment of his fault at thirty percent, the final judgment awarded him $630,000. Because Rucker was found to be seventy percent at fault, he recovered nothing despite his damages of $400,000.

Proof of Causation

The plaintiffs' burden was to prove that the roughness of the ride of the coal haulers was probably a contributing cause of their back injuries, without which those injuries would not have been suffered. We review "the evidence in its strongest light in favor" of the plaintiffs, giving them "the advantage of every fair and reasonable inference which the evidence justifies."[2]

The circumstantial evidence of the relation between the rough ride of the coal haulers and plaintiffs' back injuries was more than reasonable; it was compelling. The doctors and engineers testified to the jolts on the bodies of the drivers, causing compression upon their spines. The MRI

---

[2]*Jones & Laughlin Steel Corp. v. Matherne*, 348 F.2d 394, 397-98 (5th Cir. 1965).

5

pictures of their spines demonstrated cumulative, repetitive compression fractures, according to the neurosurgeon and radiologist. The radiologist exhibited MRIs of the five plaintiffs as well as eighty-five other drivers of the short nosed haulers and explained how the incidence and location of multiple fractures demonstrated extensive and prolonged trauma. He compared those MRIs with other patients with back injuries but who lacked the same multiple fractures, or what he termed the "fingerprint" of the occupation of the former. One of the Austalian engineers referred to *Clinical Biomechanics of the Spine*,[3] which provided that vibrations of the type and level experienced in the short nosed haulers are known to produce spinal damage.[4]

## Expert Witness Evidence

The radiologist, Dr. Aprill, and the neurosurgeon, Dr. Samaratunga, were qualified to give their opinion on the readings of the MRIs and of the injuries suffered by Luker and Rucker. Euclid complains of Aprill's opinion that the short nosed coal haulers caused plaintiffs' injuries, but Aprill expressly said that he claimed no knowledge of the coal haulers and only testified about the compression fractures shown on the MRIs. He did testify that all of the 90 MRIs demonstrated a common compression injury. Only when Euclid's lawyer asked him if he did not think driving the hauler caused the injuries did he agree with that conclusion inasmuch as driving the haulers was the common occupation.

Euclid also argues that Aprill's testimony about his study of the comparison between the

---

[3]AUGUSTUS A. WHITE & MANOHAR M. PANJABI, CLINICAL BIOMECHANICS OF THE SPINE (2d ed. 1990).

[4]Interestingly, although Euclid's counsel admitted that this witness had an "impressive resume," when counsel went on to fault the witness for being no doctor or statistician and having published no studies, the engineer replied that "in Australia, experience and diligent study count[] along with formal qualifications."

MRIs of the drivers and the MRIs of the other patients lacked the support of the *Daubert*

criteria.[5]  Aprill did describe his ongoing study of intravertibral endplate fractures in those terms,

but the evidence given to this jury was only illustrative of his findings from the two sets of MRIs.

The "study" was nothing more than a comparison of otherwise admissible findings or exhibits.

The district judge did not abuse his discretion in the admission of this expert testimony.[6]

## Statute of Limitations

The MRIs of the endplate fractures objectively proved the plaintiffs' cumulative

compression damage, but such damage is not otherwise symptomatic.  Accordingly, it was the

kind of injury not likely to be discovered within the prescribed two-year limitations period,[7]

despite faithful diligence;[8] the plaintiffs had no reason to suspect that they were being injured by

the vibration.[9]  In light of the evidence on ride quality marshaled by the plaintiffs in this extensive

record, it cannot be disputed that these short nosed haulers had ride problems, which is proven by

direct, physical evidence of their vibration characteristics collected by accelerometer, testified to

by multiple witnesses, both expert and lay, and admitted by Euclid's chief engineer and the dealer

in Australia, who was authorized to sell Euclid equipment at that time.  As to the injury, Luker

brought his claim for his compression damage shortly after it was diagnosed, which was made as

---

[5]*See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593-95, 113 S. Ct. 2786, 2796-97, 125 L. Ed. 2d 469 (1993).

[6]*See General Elec. Co. v. Joiner*, 522 U.S. 136, ___, 118 S. Ct. 512, 517, 139 L. Ed. 2d 508 (1997).

[7]Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a) (Vernon 1986 & Supp. 1999).

[8]*See S.V. v. R.V.*, 933 S.W.2d 1, 6-7 (Tex. 1996).

[9]*Id.* at 8.

soon as was reasonably possible given the nature of this injury. As such, Luker's claims were

filed within two years of discovery in accordance with the Texas discovery rule.[10]

Proportionate Responsibility

The record supports the jury's determination that some negligence of Luker and Rucker

aggravated their injuries for the reasons stated in the panel opinion.

AFFIRMED.

---

[10]Judge DeMoss would extend the Texas holdings in the cases of misdiagnosis and repressed memory to the present case. We see no basis for this extension in the Texas decisions. Furthermore, we note that he has to concede that the prior injury actually occurred or else there would be no limitations bar.

DeMOSS, Circuit Judge, dissenting:

This case appears before our Court based on our diversity jurisdiction. We are, therefore, duty-bound to apply state law in resolving the appeal. The law of the State of Texas clearly calls for reversal. If for no other reason, the judgment below should be reversed because all of Luker's and Rucker's claims are barred by limitations.

Texas statutory law requires that personal injury lawsuits be filed within two years of the accrual of the cause of action. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a) (Vernon 1986 & Supp. 1999). A cause of action accrues at the time a wrongful act causes some legal injury, regardless of when that injury is discovered. *See*, *e.g.*, **S.V. v. R.V.**, 933 S.W.2d 1, 4 (Tex. 1996). In a comprehensive review and restatement of the law relating to the statute of limitations, the Supreme Court of Texas distilled the following rule from its previous holdings: "accrual of a cause of action is deferred in cases of fraud or in which the wrongdoing is fraudulently concealed, and in discovery rule cases in which the alleged wrongful act and resulting injury were inherently undiscoverable at the time they occurred but may be objectively verified." *Id.* at 6.

The jury in this case specifically found that Luker and Rucker failed to file their lawsuits within two years of the date they first suffered some injury as a result of riding in the short-nose coal haulers. Luker's and Rucker's claims are therefore time-barred unless they can invoke an exception to the operation of the Texas statute of limitations. The jury determined that Euclid did not fraudulently conceal any wrong; and therefore Luker and Rucker can evade the statute of limitations if, and only if, this case falls within the limited set of circumstances in which the discovery rule applies.

9

The discovery rule only applies if the nature of the injury is "inherently undiscoverable" and the injury itself is "objectively verifiable." *E.g.*, ***HECI Exploration Co. v. Neel***, 982 S.W.2d 881, 886 (Tex. 1998); ***Childs v. Haussecker***, 974 S.W.2d 31, 36 (Tex. 1998); ***S.V.***, 933 S.W.2d at 6; ***Computer Assocs. Int'l, Inc. v. Altai, Inc.***, 918 S.W.2d 453, 456 (Tex. 1996). These requirements "balance the conflicting policies in statutes of limitations: the benefits of precluding stale or spurious claims versus the risks of precluding meritorious claims that happen to fall outside an arbitrarily set period." ***S.V.***, 933 S.W.2d at 6. Although the jury in this case purported to determine that the plaintiffs' injuries met both of these criteria, the history of the application of the discovery rule by the Supreme Court of Texas clearly demonstrates, as a matter of law, that neither the wrong nor the injuries in this case were objectively verifiable.

An objectively verifiable injury exists where "the presence of injury and the producing wrongful act cannot be disputed." ***Howard v. Fiesta Tex. Show Park, Inc.***, 980 S.W.2d 716, 720 (Tex. App.--San Antonio 1998, pet. denied). The injury must be proved by "direct, physical evidence." ***Hay v. Shell Oil Co.***, 986 S.W.2d 772, 776 (Tex. App.--Corpus Christi 1999, pet. filed). The paradigmatic example of the type of evidence necessary to objectively verify the wrong and the injury was provided in ***Gaddis v. Smith***, 417 S.W.2d 577 (Tex. 1967), in which doctors were sued for negligence in leaving a sponge inside the body of a patient. The presence of the sponge in the patient and the explanation for how the sponge came to be in the patient's body were self-evident and based on direct, physical evidence. In contrast, the prime example of a case in which the discovery rule does not apply for lack of objective verification is ***Robinson v. Weaver***, 550 S.W.2d 18 (Tex. 1977). The plaintiff's claim stemmed from alleged misdiagnosis of a back condition. Faced with the task of proving both a mistake in professional judgment and that

-10-

such mistake was negligent, the plaintiff could not take advantage of the discovery rule. Expert testimony would have been required to prove that case, and the court concluded that expert testimony did not supply the required objective verification of wrong and injury. *See Robinson*, 550 S.W.2d at 21; *see also S.V.*, 933 S.W.2d at 7. "[T]he bar of limitations cannot be lowered for no other reason than a swearing match between parties over facts and between experts over opinions." *S.V.*, 933 S.W.2d at 15.

The case now before our Court is indistinguishable from *Robinson*. It features a factual dispute about the existence and extent of vibration in short-nose coal haulers and other heavy equipment. Even more to the point, however, the case features a dispute among experts as to whether injury exists, and if so whether it was caused by the excessive vibration of the short-nose coal hauler. Dr. Aprill, a radiologist and an expert witness for the plaintiffs, provided the only testimony supporting the plaintiffs' claims of injury. He discovered "endplate infractions" in the plaintiffs' spines by studying MRI scans of the plaintiffs' backs. Dr. Gallman, also a radiologist and an expert witness for the defense, testified that he had never seen or heard of the term "endplate infraction." He believes that Dr. Aprill coined the term especially for use in this litigation. Dr. Gallman further testified that he had reviewed the plaintiffs' MRIs and found no abnormalities. Instead, he testified that the phenomenon termed "endplate infraction" by Dr. Aprill is "extremely common," having "no significance" and seen "every day on multiple studies of patients from all walks of life." This assessment was supported by Dr. Pope, another defense witness who is a leading authority and a distinguished professor in the areas of biomedical engineering, orthopedic surgery, preventative medicine, and mechanical engineering. On cross-

examination, Dr. Aprill conceded that different radiologists could draw different conclusions from an MRI.

There has been no objective verification of the plaintiffs' injuries, as is required to invoke the discovery rule. Like ***Robinson***, the plaintiffs' case absolutely relies on expert testimony to establish both wrong and injury. Like ***Robinson***, this case features a swearing match among experts which touches not only the cause of injury but even the fact of injury. By conceding that different radiologists could draw different conclusions from the MRIs, Dr. Aprill established that the evidence of injury in this case is subjective, not objective; it all depends on who reads the MRI. In such a case, the Supreme Court of Texas would not permit application of the discovery rule. It is our obligation to apply the same rule in the exercise of our diversity jurisdiction.

For these reasons, as well as the other reasons articulated in my dissent from the panel opinion*, see* 158 F.3d at 277-91, I would hold that Euclid's motion for judgment as a matter of law on the grounds the claims were barred by the Texas two-year statute of limitations should have been granted. I, therefore, respectfully dissent.