SLOVITER, Circuit Judge,
dissenting.
It is an important evidentiary principle, one that the majority recognizes, that “[i]t is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record.” Maj.Op. at 414. The District Court in this case allowed an expert to give testimony that was “wholly lacking foundation in the record.” Elcock v. Kmart Corp., 233 F.3d 734, 754 (3d Cir.2000). In so doing, the District Court abused its discretion. Because the majority finds that “[t]he District Court properly exercised its discretion in admitting [this] testimony,” Maj.Op. at 415,1 dissent.
I.
DR. EAGAR’S TESTIMONY CONCERNING CAUSE OF CRASH
Defendants, the designers, manufacturers and testers of the troubled Osprey *417 aircraft, argue that the crash at issue in this case was caused when hydraulic fluid entered the right engine of the aircraft due to a loose hydraulic fitting. In support of this theory, Defendants offered the testimony of Dr. Thomas Eagar. App. at 1552—1722. Dr. Eagar testified that “the most probable source of fuel [which caused the aircraft’s engine to fail] was the hydraulic fluid.” App. at 1627. Dr. Eagar said that he based that opinion on the presence of red residue “all over the torque[ ]meter housing,” App. at 1627, the gas chromatography detailed in the GM/Allison Accident Investigation and Residue Chemical Analysis Report (henceforth, GM/Allison Report), see App. 2380-90, the amount of fluid in the right nacelle, the burn damage in the upper nacelle, and the fact that there was a loose nut on the hydraulic fitting. App. at 1627-28.
Federal Rule of Evidence 703 states that “[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.” Fed.R.Evid. 703. This rule imposes upon a trial judge the obligation to determine whether to admit expert testimony:
Rule 703 thus focuses on the data underlying the expert’s opinion.... “[W]hen a trial judge analyzes whether an expert’s data is of a type reasonably relied on by experts in the field, he or she should assess whether there are good grounds to rely on this data to draw the conclusion reached by the expert.” If the data underlying the expert’s opinion are so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded. The key inquiry is reasonable reliance and that inquiry dictates that the “trial judge must conduct an independent evaluation into reasonableness.” Rule 703’s reliability standard is similar to Rule 702’s reliability requirement, i.e., “there must be good grounds on which to find the data reliable.”
In re TMI Litig., 193 F.3d 613, 697 (3d Cir.1999) (alteration in original) (citations omitted) (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 748-49 (3d Cir.1994)).
Appellants, plaintiffs below, contend, that Dr. Eagar’s opinion that the crash was caused by a hydraulic fuel leak lacked a factual basis and therefore the District Court should have excluded it. Specifically, they contest each, of the three main factual predicates for Dr. Eagar’s opinion: (1) the presence of hydraulic fluid inside the engine, (2) the timing of the hydraulic fluid leak, and (3) the loose nut found on a hydraulic fitting. I discuss each of these in turn.
A. Hydraulic Fluid in the Engine
At trial, a defense attorney, in discussing Dr. Eagar’s testimony, said that “the critical evidence ... is that the [GM/] AUi-son [R]eport shows profuse quantities of hydraulic oil in the engine, and that’s evidence of the fact that it was hydraulic ... oil that caused the engine to fail.” App. at 1623. Appellants challenge the “critical” factual support for Dr. Eagar’s testimony that hydraulic fluid was found inside the engine. I agree with Appellants. The record evidence, in particular the GM/Allison Report, does not indicate that hydraulic oil was found inside the engine.
The key page of the report contained a number of findings. See App. at 2389. It indicated that infra-red scans of a red residue, taken from the engine, showed “some similarities” to hydraulic fluid, “but no definitive match could be made.” App. at 2389. Instead, the-residue contained glycol ether, which Dr. Eagar conceded “is indicative of transmission oil.” App. at *418 1922. This is consistent with Appellants’ theory that transmission oil, rather than hydraulic fluid, was dumped into the engine. Further, gas chromatography of a residue taken from the torquemeter housing “indicated a reasonable agreement” to hydraulic fluid, and “suggested] that [it] was composed of engine oil and hydraulic fluid.” App. at 2389. However, Dr. Eagar admitted at trial that the torquemeter housing was outside the engine. See App. at 1924. Additionally, an earlier section in the GM/Allison Report summarized the findings — that hydraulic oil could only be identified outside the engine:
The compressor blade track areas [inside the engine] showed a red trace which was not sufficient to determine its source. The material ... in the tor-quemeter [outside the engine] housing, also red in color, is a good match to the hydraulic fluid known to be in use on the aircraft hydraulic system.
App. at 2385. In fact, the report concluded that the red residue found inside the engine “was most probably the flame sprayed compressor blade track material” and not hydraulic oil. App. at 2388. Therefore, the only data in the report that even remotely suggested that hydraulic oil was found inside the engine was at best inconclusive. By the report’s own terms, “no definitive match could be made.” App. at 2389.
Additionally, in one of their briefs, Defendants suggest that other analyses revealed hydraulic oil in the Engine Air Particle Separator (“EAPS”). Br. of Bell Helicopter at 10. However, there are no reports in the record that support this assertion. Instead, Bell cites to the GM7A1-lison Report, which merely states that “[t]he only remaining source potential is from a non-engine source entrained in the inlet airstream,” App. at 2385, and Dr. Eagar’s own testimony, App. at 1584. In any event, as the EAPS is outside the engine, see App. at 1907, this does not support Dr. Eagar’s conclusion that there was hydraulic fluid in the engine.
B. Timing of the Hydraulic Leak
Appellants also challenge Defendants’ evidence concerning the timing of the hydraulic leak that Dr. Eagar claimed caused the crash. Dr. Eagar claimed that the aircraft “lost over a gallon of [hydraulic] fluid” while in flight. App. at 1628. Appellants concede that a leak occurred. However, they argue that the hydraulic leak resulted from, rather than caused, the engine surges and resulting failures. As evidence for this, Appellants rely on the time-line from the Court of Inquiry Report, App. at 2280-372, that is based on data from the plane’s flight data recorder. According to the Court of Inquiry Report, the first hydraulic system failed “due to a leak” which occurred almost twenty-seven seconds after the first engine surge, App. at 2316, which had occurred when “a flammable substance was consumed by the engine.” App. at 2315. In addition to data from the Osprey’s flight data recorder, other evidence discussed in the Court of Inquiry Report suggests that hydraulic leakage occurred after engine failure. This evidence contributed to the report’s conclusion that oil from the proprotor gearbox got into the aircraft’s engine. See, e.g., App. at 2363.
Dr. Eagar rejected the conclusion of the Court of Inquiry Report and its reliance on the flight data recorder. He explained that the Osprey’s computer system only detected when a system failed; it did not detect when a leak began. App. at 1929-30. He testified that a leak could be present “for up to 43 seconds before [it] gets big enough for the system to detect it.” App. at 1930. Defendants, however, failed to present any evidence corroborating Dr. *419 Eagar’s description of how the Osprey’s systems detected hydraulic leaks. Therefore, his claim about the timing of the hydraulic leak and his use of this claim to support his conclusion that the hydraulic leak played a causal role in the crash amount to little more than unsupported assertions.
C. Loose Nut
Finally, Appellants challenge Dr. ■ Ea-gar’s conclusions concerning the loose hydraulic nut found after the crash. According to Dr. Eagar’s testimony:
I knew there was a' loose nut ... they had problems with hydraulics, they had been having leaks in hydraulics for six months ahead of time, and I specifically told the jury that I could not point out the exact location of this leak except I believed it was in the upper nacelle.
App. at 1817. Dr. Eagar also testified that he had “no direct evidence” that the hydraulic nut in question was the source of the leak, nor did he have further evidence of any other loose nuts. App. at 1628 (“We don’t know that that loose nut on the hydraulic fitting was the source of the leak.”). He merely testified that the loose nut could explain the hydraulic leak. App. at 1932-33. Thus, even Dr. Eagar failed to suggest that the loose nut was the probable source of the crash. Further, the Court of Inquiry Report found the loose hydraulic nut was cáused by the impact of the aircraft’s crash. App. at 2332. A Boeing report agreed, finding that “the looseness resulted from a mechanical overload at impact.” App. at 2393.
D. Summary
The established factual basis for Dr. Ea-gar’s testimony can be described as follows: (1) gas chromatography indicates that hydraulic fluid was found outside the engine, (2) hydraulic fluid is red, and a red residue was found inside the engine, and (3) a loose hydraulic fitting was found in the aircraft wreckage. The remaining “facts” presented by Defendants are either flatly contradicted by the record or are merely unsupported assertions by Dr. Ea-gar. The evidence in the record fails to provide a reasonable factual basis for Dr. Eagar’s opinion that the crash probably resulted from a hydraulic fluid leak.
II.
I agree with the majority opinion that bur standard of review for evidentiary rulings is “principally for abuse of discretion.” Maj.Op. at 412. Such a review is not, however, an “empty exercise.” Koon v. United States, 518 U.S. 81, 98, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (discussing abuse of discretion standard). This court’s precedents and those of the Supreme Court as they relate to expert testimony require a district court to “ ‘examine the expert’s conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used.’ ” Oddi v. Ford Motor Co., 234 F.3d 136, 146 (3d Cir.2001) (quoting Heller v. Shaw Indus., Inc., 167 F.3d 146, 153 (3d Cir.1999)). See also Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (“[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.”); Tyger Constr. Co., Inc. v. Pensacola Constr. Co., 29 F.3d 137, 142 (4th Cir.1994) (“An expert’s opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record.”) (citing E. Auto Distribs., Inc. v. Peugeot Motors of Am., 795 F.2d 329, 337 (4th Cir.1986)). Such an examination may lead a court to the conclusion that “there is simply too great a gap between the data and the opinion of *420 fered.” Gen. Elec., 522 U.S. at 146, 118 S.Ct. 512. There may be a natural tendency of judges, when presented with a technical question and a reasonable sounding expert witness, to admit the evidence and let the jury decide the issue. But we have a responsibility that we may not shirk. A district court abuses its discretion if it admits expert testimony that lacks an adequate factual basis.
In most cases, the lack of factual support for an expert opinion affects its weight rather than its admissibility. However, based upon my review of the record, there simply is no factual support for Dr. Eagar’s conclusion that a hydraulic fluid leak caused the crash. This goes directly to the admissibility of Dr. Eagar’s testimony, as Defendants in effect admitted when they explicitly conditioned the admissibility of Dr. Eagar’s testimony on that fact. App. at 1623 (describing the existence of “profuse quantities of hydraulic oil in the engine” as “critical” evidence on which Dr. Eagar’s testimony was based). While the evidence does indicate that hydraulic fluid leaked outside the engine and that a hydraulic nut was loose after the crash, Appellants present ample evidence — including the Osprey’s flight data recorder, the Court of Inquiry Report, and a post-crash analysis by Boeing — that these did not cause the crash, but rather resulted from it. In contrast, Defendants present no further evidence other than the unsupported assertions and theories of Dr. Eagar. Even when viewed in a light most favorable to Defendants, the evidence merely suggests the remote possibility that a hydraulic fluid leak may have caused the Osprey’s crash. Dr. Eagar’s ultimate opinion “that the most probable source of [engine failure] was the hydraulic fluid,” App. at 1627, was merely speculation and without factual support. The District Court abused its discretion in admitting this part of his testimony.
The majority’s analysis of the factual basis for Dr. Eagar’s testimony simply recapitulates the District Court’s mistake of accepting Dr. Eagar’s claim that the record supports his view. The majority summarizes what it sees as the record support for Dr. Eagar’s opinion on the cause of the crash as follows:
the record reflects a factual foundation sufficient to support Dr. Eagar’s opinion that the most probable source of flammable fluid was hydraulic fluid. The record shows that, of the possible fluids involved in the accident, only hydraulic fluid is red. A red residue was found in the torquemeter housing. This red residue was tested for the Court of Inquiry and found to be a good match for hydraulic fluid. There was some hydraulic oil found in front of the engine and it may have gotten into the engine. Finally, a red residue containing hydraulic oil was discovered on the engine air particle separator, adjacent to the engine. Thus, the record reflects sufficient evidence of hydraulic fluid solvent in places it should not have been — outside the engine, near the engine, and in the torquemeter housing — to form the factual foundation for Dr. Eagar’s testimony.
Maj.Op. at 414. Because the majority comes to the conclusion that the record provides a basis for Dr. Eagar’s testimony, it found that the District Court did not abuse its discretion in admitting his testimony on this point. In contrast, on my examination of the record evidence, Dr. Eager’s testimony concerning the likely cause of the crash is without basis. For this reason, I respectfully dissent.