GENERAL ELECTRIC CO. ET AL. *v.* JOINER ET UX.

No. 96–188.   Argued October 14, 1997—Decided December 15, 1997

REHNQUIST, C. J., delivered the opinion for a unanimous Court with respect to Parts I and II, and the opinion of the Court with respect to Part III, in which O'CONNOR, SCALIA, KENNEDY, SOUTER, THOMAS, GINSBURG, and BREYER, JJ., joined. BREYER, J., filed a concurring opinion,

*post*, p. 147. STEVENS, J., filed an opinion concurring in part and dissenting in part, *post*, p. 150.

*Steven R. Kuney* argued the cause for petitioners. With him on the briefs were *John G. Kester, David H. Flint, Alexander J. Simmons, Jr., Henry W. Ewalt,* and *Gerard H. Davidson, Jr.*

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Acting Solicitor General Dellinger, Assistant Attorney General Hunger, Edward C. DuMont,* and *John P. Schnitker.*

*Michael H. Gottesman* argued the cause for respondents. With him on the brief were *Kenneth J. Chesebro, David L. Shapiro,* and *Michael J. Warshauer.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

We granted certiorari in this case to determine what standard an appellate court should apply in reviewing a trial

---

*Briefs of *amici curiae* urging reversal were filed for the Chamber of Commerce of the United States by *Thomas S. Martin, Stephen A. Bokat,* and *Robin S. Conrad;* for the American Medical Association by *Jack R. Bierig, Carter G. Phillips, Kirk B. Johnson,* and *Michael L. Ile;* for the Chemical Manufacturers Association by *Bert Black, David J. Schenck,* and *Donald D. Evans;* for Dow Chemical Company by *John E. Muench* and *Robert M. Dow, Jr.;* for the Pharmaceutical Research and Manufacturers of America by *Bruce N. Kuhlik;* for the Washington Legal Foundation by *Arvin Maskin, Gerald A. Stein, Daniel J. Popeo,* and *Paul D. Kamenar;* and for Bruce Ames et al. by *Martin S. Kaufman* and *Douglas Foster.*

Briefs of *amici curiae* urging affirmance were filed for the Trial Lawyers for Public Justice by *Steven E. Fineman* and *Arthur H. Bryant;* for the Association of Trial Lawyers of America by *Jeffrey Robert White;* for Ardith Cavallo by *William A. Beeton, Jr.;* and for Peter Orris, M. D., et al. by *Gerson H. Smoger.*

Briefs of *amici curiae* were filed for the New England Journal of Medicine et al. by *Margaret S. Woodruff* and *Arlin M. Adams;* and for the Product Liability Advisory Council, Inc., et al. by *Mary A. Wells, Jan S. Amundson,* and *Quentin Riegel.*

court's decision to admit or exclude expert testimony under *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U. S. 579 (1993). We hold that abuse of discretion is the appropriate standard. We apply this standard and conclude that the District Court in this case did not abuse its discretion when it excluded certain proffered expert testimony.

I

Respondent Robert Joiner began work as an electrician in the Water & Light Department of Thomasville, Georgia (City), in 1973. This job required him to work with and around the City's electrical transformers, which used a mineral-oil-based dielectric fluid as a coolant. Joiner often had to stick his hands and arms into the fluid to make repairs. The fluid would sometimes splash onto him, occasionally getting into his eyes and mouth. In 1983 the City discovered that the fluid in some of the transformers was contaminated with polychlorinated biphenyls (PCB's). PCB's are widely considered to be hazardous to human health. Congress, with limited exceptions, banned the production and sale of PCB's in 1978. See 90 Stat. 2020, 15 U. S. C. § 2605(e)(2)(A).

Joiner was diagnosed with small-cell lung cancer in 1991. He[1] sued petitioners in Georgia state court the following year. Petitioner Monsanto manufactured PCB's from 1935 to 1977; petitioners General Electric and Westinghouse Electric manufactured transformers and dielectric fluid. In his complaint Joiner linked his development of cancer to his exposure to PCB's and their derivatives, polychlorinated dibenzofurans (furans) and polychlorinated dibenzodioxins (dioxins). Joiner had been a smoker for approximately eight years, his parents had both been smokers, and there was a history of lung cancer in his family. He was thus perhaps already at a heightened risk of developing lung cancer eventually. The suit alleged that his exposure to PCB's "pro-

---

[1] Joiner's wife was also a plaintiff in the suit and is a respondent here. For convenience, we refer to respondent in the singular.

moted" his cancer; had it not been for his exposure to these substances, his cancer would not have developed for many years, if at all.

Petitioners removed the case to federal court. Once there, they moved for summary judgment. They contended that (1) there was no evidence that Joiner suffered significant exposure to PCB's, furans, or dioxins, and (2) there was no admissible scientific evidence that PCB's promoted Joiner's cancer. Joiner responded that there were numerous disputed factual issues that required resolution by a jury. He relied largely on the testimony of expert witnesses. In depositions, his experts had testified that PCB's alone can promote cancer and that furans and dioxins can also promote cancer. They opined that since Joiner had been exposed to PCB's, furans, and dioxins, such exposure was likely responsible for Joiner's cancer.

The District Court ruled that there was a genuine issue of material fact as to whether Joiner had been exposed to PCB's. But it nevertheless granted summary judgment for petitioners because (1) there was no genuine issue as to whether Joiner had been exposed to furans and dioxins, and (2) the testimony of Joiner's experts had failed to show that there was a link between exposure to PCB's and small-cell lung cancer. The court believed that the testimony of respondent's experts to the contrary did not rise above "subjective belief or unsupported speculation." 864 F. Supp. 1310, 1326 (ND Ga. 1994). Their testimony was therefore inadmissible.

The Court of Appeals for the Eleventh Circuit reversed. 78 F. 3d 524 (1996). It held that "[b]ecause the Federal Rules of Evidence governing expert testimony display a preference for admissibility, we apply a particularly stringent standard of review to the trial judge's exclusion of expert testimony." *Id.*, at 529. Applying that standard, the Court of Appeals held that the District Court had erred in excluding the testimony of Joiner's expert witnesses. The

District Court had made two fundamental errors. First, it excluded the experts' testimony because it "drew different conclusions from the research than did each of the experts." The Court of Appeals opined that a district court should limit its role to determining the "legal reliability of proffered expert testimony, leaving the jury to decide the correctness of competing expert opinions." *Id.*, at 533. Second, the District Court had held that there was no genuine issue of material fact as to whether Joiner had been exposed to furans and dioxins. This was also incorrect, said the Court of Appeals, because testimony in the record supported the proposition that there had been such exposure.

We granted petitioners' petition for a writ of certiorari, 520 U. S. 1114 (1997), and we now reverse.

## II

Petitioners challenge the standard applied by the Court of Appeals in reviewing the District Court's decision to exclude respondent's experts' proffered testimony. They argue that that court should have applied traditional "abuse of discretion" review. Respondent agrees that abuse of discretion is the correct standard of review. He contends, however, that the Court of Appeals applied an abuse-of-discretion standard in this case. As he reads it, the phrase "particularly stringent" announced no new standard of review. It was simply an acknowledgment that an appellate court can and will devote more resources to analyzing district court decisions that are dispositive of the entire litigation. All evidentiary decisions are reviewed under an abuse-of-discretion standard. He argues, however, that it is perfectly reasonable for appellate courts to give particular attention to those decisions that are outcome determinative.

We have held that abuse of discretion is the proper standard of review of a district court's evidentiary rulings. *Old Chief* v. *United States,* 519 U. S. 172, 174, n. 1 (1997); *United States* v. *Abel,* 469 U. S. 45, 54 (1984). Indeed, our cases on

the subject go back as far as *Spring Co.* v. *Edgar*, 99 U. S. 645, 658 (1879), where we said that "[c]ases arise where it is very much a matter of discretion with the court whether to receive or exclude the evidence; but the appellate court will not reverse in such a case, unless the ruling is manifestly erroneous." The Court of Appeals suggested that *Daubert* somehow altered this general rule in the context of a district court's decision to exclude scientific evidence. But *Daubert* did not address the standard of appellate review for evidentiary rulings at all. It did hold that the "austere" *Frye* standard of "general acceptance" had not been carried over into the Federal Rules of Evidence. But the opinion also said:

> "That the *Frye* test was displaced by the Rules of Evidence does not mean, however, that the Rules themselves place no limits on the admissibility of purportedly scientific evidence. Nor is the trial judge disabled from screening such evidence. To the contrary, under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U. S., at 589 (footnote omitted).

Thus, while the Federal Rules of Evidence allow district courts to admit a somewhat broader range of scientific testimony than would have been admissible under *Frye*, they leave in place the "gatekeeper" role of the trial judge in screening such evidence. A court of appeals applying "abuse-of-discretion" review to such rulings may not categorically distinguish between rulings allowing expert testimony and rulings disallowing it. Compare *Beech Aircraft Corp.* v. *Rainey*, 488 U. S. 153, 172 (1988) (applying abuse-of-discretion review to a lower court's decision to exclude evidence), with *United States* v. *Abel, supra*, at 54 (applying abuse-of-discretion review to a lower court's decision to admit evidence). We likewise reject respondent's argument that because the granting of summary judgment in this case

was "outcome determinative," it should have been subjected to a more searching standard of review. On a motion for summary judgment, disputed issues of fact are resolved against the moving party—here, petitioners. But the question of admissibility of expert testimony is not such an issue of fact, and is reviewable under the abuse-of-discretion standard.

We hold that the Court of Appeals erred in its review of the exclusion of Joiner's experts' testimony. In applying an overly "stringent" review to that ruling, it failed to give the trial court the deference that is the hallmark of abuse-of-discretion review. See, e. g., Koon v. United States, 518 U. S. 81, 98–99 (1996).

## III

We believe that a proper application of the correct standard of review here indicates that the District Court did not abuse its discretion. Joiner's theory of liability was that his exposure to PCB's and their derivatives "promoted" his development of small-cell lung cancer. In support of that theory he proffered the deposition testimony of expert witnesses. Dr. Arnold Schecter testified that he believed it "more likely than not that Mr. Joiner's lung cancer was causally linked to cigarette smoking and PCB exposure." App. 107. Dr. Daniel Teitelbaum testified that Joiner's "lung cancer was caused by or contributed to in a significant degree by the materials with which he worked." Id., at 140.

Petitioners contended that the statements of Joiner's experts regarding causation were nothing more than speculation. Petitioners criticized the testimony of the experts in that it was "not supported by epidemiological studies . . . [and was] based exclusively on isolated studies of laboratory animals." 3 Record, Doc. No. 46 (Defendants' Joint Memorandum in Support of Summary Judgment 3). Joiner responded by claiming that his experts had identified "relevant animal studies which support their opinions." 4 Record, Doc. No. 53 (Plaintiffs' Brief in Opposition to Defendants'

Motion for Summary Judgment 47). He also directed the court's attention to four epidemiological studies[2] on which his experts had relied.

The District Court agreed with petitioners that the animal studies on which respondent's experts relied did not support his contention that exposure to PCB's had contributed to his cancer. The studies involved infant mice that had developed cancer after being exposed to PCB's. The infant mice in the studies had had massive doses of PCB's injected directly into their peritoneums[3] or stomachs. Joiner was an adult human being whose alleged exposure to PCB's was far less than the exposure in the animal studies. The PCB's were injected into the mice in a highly concentrated form. The fluid with which Joiner had come into contact generally had a much smaller PCB concentration of between 0-to-500 parts per million. The cancer that these mice developed was alveologenic adenomas; Joiner had developed small-cell carcinomas. No study demonstrated that adult mice developed cancer after being exposed to PCB's. One of the experts admitted that no study had demonstrated that PCB's lead to cancer in any other species.

Respondent failed to reply to this criticism. Rather than explaining how and why the experts could have extrapolated their opinions from these seemingly far-removed animal studies, respondent chose "to proceed as if the only issue [was] whether animal studies can ever be a proper foundation for an expert's opinion." 864 F. Supp., at 1324. Of course, whether animal studies can ever be a proper foundation for an expert's opinion was not the issue. The issue was whether *these* experts' opinions were sufficiently supported by the animal studies on which they purported to rely. The studies were so dissimilar to the facts presented in this liti-

---

[2] Epidemiological studies examine the pattern of disease in human populations.

[3] The peritoneum is the lining of the abdominal cavity.

gation that it was not an abuse of discretion for the District Court to have rejected the experts' reliance on them.

The District Court also concluded that the four epidemiological studies on which respondent relied were not a sufficient basis for the experts' opinions. The first such study involved workers at an Italian capacitor[4] plant who had been exposed to PCB's. Bertazzi, Riboldi, Pesatori, Radice, & Zocchetti, Cancer Mortality of Capacitor Manufacturing Workers, 11 American Journal of Industrial Medicine 165 (1987). The authors noted that lung cancer deaths among ex-employees at the plant were higher than might have been expected, but concluded that "there were apparently no grounds for associating lung cancer deaths (although increased above expectations) and exposure in the plant." Id., at 172. Given that Bertazzi et al. were unwilling to say that PCB exposure had caused cancer among the workers they examined, their study did not support the experts' conclusion that Joiner's exposure to PCB's caused his cancer.

The second study followed employees who had worked at Monsanto's PCB production plant. J. Zack & D. Musch, Mortality of PCB Workers at the Monsanto Plant in Sauget, Illinois (Dec. 14, 1979) (unpublished report), 3 Record, Doc. No. 11. The authors of this study found that the incidence of lung cancer deaths among these workers was somewhat higher than would ordinarily be expected. The increase, however, was not statistically significant and the authors of the study did not suggest a link between the increase in lung cancer deaths and the exposure to PCB's.

The third and fourth studies were likewise of no help. The third involved workers at a Norwegian cable manufacturing company who had been exposed to mineral oil. Ronneberg, Andersen, & Skyberg, Mortality and Incidence of Cancer Among Oil Exposed Workers in a Norwegian Cable Manufacturing Company, 45 British Journal of Indus-

---

[4] A capacitor is an electrical component that stores an electric charge.

trial Medicine 595 (1988). A statistically significant increase in lung cancer deaths had been observed in these workers. The study, however, (1) made no mention of PCB's and (2) was expressly limited to the type of mineral oil involved in that study, and thus did not support these experts' opinions. The fourth and final study involved a PCB-exposed group in Japan that had seen a statistically significant increase in lung cancer deaths. Kuratsune, Nakamura, Ikeda, & Hirohata, Analysis of Deaths Seen Among Patients with Yusho—A Preliminary Report, 16 Chemosphere, Nos. 8/9, p. 2085 (1987). The subjects of this study, however, had been exposed to numerous potential carcinogens, including toxic rice oil that they had ingested.

Respondent points to *Daubert*'s language that the "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." 509 U. S., at 595. He claims that because the District Court's disagreement was with the conclusion that the experts drew from the studies, the District Court committed legal error and was properly reversed by the Court of Appeals. But conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. See *Turpin* v. *Merrell Dow Pharmaceuticals, Inc.*, 959 F. 2d 1349, 1360 (CA6), cert. denied, 506 U. S. 826 (1992). That is what the District Court did here, and we hold that it did not abuse its discretion in so doing.

We hold, therefore, that abuse of discretion is the proper standard by which to review a district court's decision to admit or exclude scientific evidence. We further hold that, because it was within the District Court's discretion to conclude that the studies upon which the experts relied were not

sufficient, whether individually or in combination, to support their conclusions that Joiner's exposure to PCB's contributed to his cancer, the District Court did not abuse its discretion in excluding their testimony. These conclusions, however, do not dispose of this entire case.

Respondent's original contention was that his exposure to PCB's, furans, and dioxins contributed to his cancer. The District Court ruled that there was a genuine issue of material fact as to whether Joiner had been exposed to PCB's, but concluded that there was no genuine issue as to whether he had been exposed to furans and dioxins. The District Court accordingly never explicitly considered if there was admissible evidence on the question whether Joiner's alleged exposure to furans and dioxins contributed to his cancer. The Court of Appeals reversed the District Court's conclusion that there had been no exposure to furans and dioxins. Petitioners did not challenge this determination in their petition to this Court. Whether Joiner was exposed to furans and dioxins, and whether if there was such exposure, the opinions of Joiner's experts would then be admissible, remain open questions. We accordingly reverse the judgment of the Court of Appeals and remand this case for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BREYER, concurring.

The Court's opinion, which I join, emphasizes *Daubert*'s statement that a trial judge, acting as "gatekeeper," must " 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.' " *Ante*, at 142 (quoting *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U. S. 579, 589 (1993)). This requirement will sometimes ask judges to make subtle and sophisticated determinations about scientific methodology and its relation to the conclusions an expert witness seeks to offer—particularly when a case arises in an area where the science itself is tentative or

uncertain, or where testimony about general risk levels in human beings or animals is offered to prove individual causation. Yet, as *amici* have pointed out, judges are not scientists and do not have the scientific training that can facilitate the making of such decisions. See, *e. g.,* Brief for Trial Lawyers for Public Justice as *Amicus Curiae* 15; Brief for New England Journal of Medicine et al. as *Amici Curiae* 2 ("Judges . . . are generally not trained scientists").

Of course, neither the difficulty of the task nor any comparative lack of expertise can excuse the judge from exercising the "gatekeeper" duties that the Federal Rules of Evidence impose—determining, for example, whether particular expert testimony is reliable and "will assist the trier of fact," Fed. Rule Evid. 702, or whether the "probative value" of testimony is substantially outweighed by risks of prejudice, confusion or waste of time, Fed. Rule Evid. 403. To the contrary, when law and science intersect, those duties often must be exercised with special care.

Today's toxic tort case provides an example. The plaintiff in today's case says that a chemical substance caused, or promoted, his lung cancer. His concern, and that of others, about the causes of cancer is understandable, for cancer kills over one in five Americans. See U. S. Dept. of Health and Human Services, National Center for Health Statistics, Health, United States 1996–97 and Injury Chartbook 117 (1997) (23.3% of all deaths in 1995). Moreover, scientific evidence implicates some chemicals as potential causes of some cancers. See, *e. g.,* U. S. Dept. of Health and Human Services, Public Health Service, National Toxicology Program, 1 Seventh Annual Report on Carcinogens, pp. v–vi (1994). Yet modern life, including good health as well as economic well-being, depends upon the use of artificial or manufactured substances, such as chemicals. And it may, therefore, prove particularly important to see that judges fulfill their *Daubert* gatekeeping function, so that they help assure that the powerful engine of tort liability, which can generate

strong financial incentives to reduce, or to eliminate, production, points toward the right substances and does not destroy the wrong ones. It is, thus, essential in this science-related area that the courts administer the Federal Rules of Evidence in order to achieve the "end[s]" that the Rules themselves set forth, not only so that proceedings may be "justly determined," but also so "that the truth may be ascertained." Fed. Rule Evid. 102.

I therefore want specially to note that, as cases presenting significant science-related issues have increased in number, see Judicial Conference of the United States, Report of the Federal Courts Study Committee 97 (Apr. 2, 1990) ("Economic, statistical, technological, and natural and social scientific data are becoming increasingly important in both routine and complex litigation"), judges have increasingly found in the Rules of Evidence and Civil Procedure ways to help them overcome the inherent difficulty of making determinations about complicated scientific, or otherwise technical, evidence. Among these techniques are an increased use of Rule 16's pretrial conference authority to narrow the scientific issues in dispute, pretrial hearings where potential experts are subject to examination by the court, and the appointment of special masters and specially trained law clerks. See J. Cecil & T. Willging, Court-Appointed Experts: Defining the Role of Experts Appointed Under Federal Rule of Evidence 706, pp. 83–88 (1993); J. Weinstein, Individual Justice in Mass Tort Litigation 107–110 (1995); cf. Kaysen, In Memoriam: Charles E. Wyzanski, Jr., 100 Harv. L. Rev. 713, 713–715 (1987) (discussing a judge's use of an economist as a law clerk in *United States* v. *United Shoe Machinery Corp.,* 110 F. Supp. 295 (Mass. 1953), aff'd, 347 U. S. 521 (1954)).

In the present case, the New England Journal of Medicine has filed an *amici* brief "in support of neither petitioners nor respondents" in which the Journal writes:

"[A] judge could better fulfill this gatekeeper function if he or she had help from scientists. Judges should be

strongly encouraged to make greater use of their inherent authority . . . to appoint experts . . . . Reputable experts could be recommended to courts by established scientific organizations, such as the National Academy of Sciences or the American Association for the Advancement of Science." Brief, *supra*, at 18–19.

Cf. Fed. Rule Evid. 706 (court may "on its own motion or on the motion of any party" appoint an expert to serve on behalf of the court, and this expert may be selected as "agreed upon by the parties" or chosen by the court); see also Weinstein, *supra*, at 116 (a court should sometimes "go beyond the experts proffered by the parties" and "utilize its powers to appoint independent experts under Rule 706 of the Federal Rules of Evidence"). Given this kind of offer of cooperative effort, from the scientific to the legal community, and given the various Rules-authorized methods for facilitating the courts' task, it seems to me that *Daubert's* gatekeeping requirement will not prove inordinately difficult to implement, and that it will help secure the basic objectives of the Federal Rules of Evidence, which are, to repeat, the ascertainment of truth and the just determination of proceedings. Fed. Rule Evid. 102.

JUSTICE STEVENS, concurring in part and dissenting in part.

The question that we granted certiorari to decide is whether the Court of Appeals applied the correct standard of review. That question is fully answered in Parts I and II of the Court's opinion. Part III answers the quite different question whether the District Court properly held that the testimony of plaintiff's expert witnesses was inadmissible. Because I am not sure that the parties have adequately briefed that question, or that the Court has adequately explained why the Court of Appeals' disposition was erroneous, I do not join Part III. Moreover, because a proper answer to that question requires a study of the record that can be

performed more efficiently by the Court of Appeals than by the nine Members of this Court, I would remand the case to that court for application of the proper standard of review.

One aspect of the record will illustrate my concern. As the Court of Appeals pointed out, Joiner's experts relied on "the studies of at least thirteen different researchers, and referred to several reports of the World Health Organization that address the question of whether PCBs cause cancer." 78 F. 3d 524, 533 (CA11 1996). Only one of those studies is in the record, and only six of them were discussed in the District Court opinion. Whether a fair appraisal of either the methodology or the conclusions of Joiner's experts can be made on the basis of such an incomplete record is a question that I do not feel prepared to answer.

It does seem clear, however, that the Court has not adequately explained why its holding is consistent with Federal Rule of Evidence 702,[1] as interpreted in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U. S. 579 (1993).[2] In general, scientific testimony that is both relevant and reliable must be admitted and testimony that is irrelevant or unreliable must be excluded. *Id.*, at 597. In this case, the District Court relied on both grounds for exclusion.

The relevance ruling was straightforward. The District Court correctly reasoned that an expert opinion that expo-

---

[1] Rule 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

[2] The specific question on which the Court granted certiorari in *Daubert* was whether the rule of *Frye* v. *United States*, 54 App. D. C. 46, 293 F. 1013 (1923), remained valid after the enactment of the Federal Rules of Evidence, but the Court went beyond that issue and set forth alternative requirements for admissibility in place of the *Frye* test. Even though the *Daubert* test was announced in dicta, see 509 U. S., at 598–601 (REHNQUIST, C. J., concurring in part and dissenting in part), we should not simply ignore its analysis in reviewing the District Court's rulings.

sure to PCB's, "furans" and "dioxins" together may cause lung cancer would be irrelevant unless the plaintiff had been exposed to those substances. Having already found that there was no evidence of exposure to furans and dioxins, 864 F. Supp. 1310, 1318–1319 (ND Ga. 1994), it necessarily followed that this expert opinion testimony was inadmissible. Correctly applying Daubert, the District Court explained that the experts' testimony "manifestly does not fit the facts of this case, and is therefore inadmissible." 864 F. Supp., at 1322. Of course, if the evidence raised a genuine issue of fact on the question of Joiner's exposure to furans and dioxins—as the Court of Appeals held that it did—then this basis for the ruling on admissibility was erroneous, but not because the District Judge either abused her discretion or misapplied the law.[3]

The reliability ruling was more complex and arguably is not faithful to the statement in Daubert that "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." 509 U. S., at 595. Joiner's experts used a "weight of the evidence" methodology to assess whether Joiner's exposure to transformer fluids promoted his lung cancer.[4] They did not suggest that any

---

[3] Petitioners do not challenge the Court of Appeals' straightforward review of the District Court's summary judgment ruling on exposure to furans and dioxins. As today's opinion indicates, ante, at 147, it remains an open question on remand whether the District Court should admit expert testimony that PCB's, furans, and dioxins together promoted Joiner's cancer.

[4] Dr. Daniel Teitelbaum elaborated on that approach in his deposition testimony: "[A]s a toxicologist when I look at a study, I am going to require that that study meet the general criteria for methodology and statistical analysis, but that when all of that data is collected and you ask me as a patient, 'Doctor, have I got a risk of getting cancer from this?' That those studies don't answer the question, that I have to put them all together in my mind and look at them in relation to everything I know about the substance and everything I know about the exposure and come to a conclusion. I think when I say, 'To a reasonable medical probability as a medical toxicologist, this substance was a contributing cause,' . . . to his cancer,

one study provided adequate support for their conclusions, but instead relied on all the studies taken together (along with their interviews of Joiner and their review of his medical records). The District Court, however, examined the studies one by one and concluded that none was sufficient to show a link between PCB's and lung cancer. 864 F. Supp., at 1324–1326. The focus of the opinion was on the separate studies and the conclusions of the experts, not on the experts' methodology. *Id.*, at 1322 ("Defendants . . . persuade the court that Plaintiffs' expert testimony would not be admissible . . . by attacking the conclusions that Plaintiffs' experts draw from the studies they cite").

Unlike the District Court, the Court of Appeals expressly decided that a "weight of the evidence" methodology was scientifically acceptable.[5] To this extent, the Court of Appeals' opinion is persuasive. It is not intrinsically "unscientific" for experienced professionals to arrive at a conclusion by weighing all available scientific evidence—this is not the sort of "junk science" with which *Daubert* was concerned.[6] After all, as Joiner points out, the Environmental Protection Agency (EPA) uses the same methodology to assess risks, albeit using a somewhat different threshold than that required in a trial. Brief for Respondents 40–41 (quoting

---

that that is a valid conclusion based on the totality of the evidence presented to me. And I think that that is an appropriate thing for a toxicologist to do, and it has been the basis of diagnosis for several hundred years, anyway." Supp. App. to Brief for Respondents 19.

[5] The court explained: "Opinions of any kind are derived from individual pieces of evidence, each of which by itself might not be conclusive, but when viewed in their entirety are the building blocks of a perfectly reasonable conclusion, one reliable enough to be submitted to a jury along with the tests and criticisms cross-examination and contrary evidence would supply." 78 F. 3d 524, 532 (CA11 1996).

[6] An example of "junk science" that should be excluded under *Daubert* as too unreliable would be the testimony of a phrenologist who would purport to prove a defendant's future dangerousness based on the contours of the defendant's skull.

EPA, Guidelines for Carcinogen Risk Assessment, 51 Fed. Reg. 33992, 33996 (1986)). Petitioners' own experts used the same scientific approach as well.[7] And using this methodology, it would seem that an expert could reasonably have concluded that the study of workers at an Italian capacitor plant, coupled with data from Monsanto's study and other studies, raises an inference that PCB's promote lung cancer.[8]

The Court of Appeals' discussion of admissibility is faithful to the dictum in *Daubert* that the reliability inquiry must focus on methodology, not conclusions. Thus, even though I fully agree with both the District Court's and this Court's explanation of why each of the studies on which the experts relied was by itself unpersuasive, a critical question remains unanswered: When qualified experts have reached relevant conclusions on the basis of an acceptable methodology, why are their opinions inadmissible?

*Daubert* quite clearly forbids trial judges to assess the validity or strength of an expert's scientific conclusions, which is a matter for the jury.[9] Because I am persuaded

---

[7] See, *e. g.*, Deposition of Dr. William Charles Bailey, Supp. App. to Brief for Respondents 56 ("I've just reviewed a lot of literature and come to some conclusions . . .").

[8] The Italian capacitor plant study found that workers exposed to PCB's had a higher-than-expected rate of lung cancer death, though "'the numbers were small [and] the value of the risk estimate was not statistically significant.'" 864 F. Supp. 1310, 1324 (ND Ga. 1994). The Monsanto study also found a correlation between PCB exposure and lung cancer death, but the results were not statistically significant. *Id.*, at 1325. Moreover, it should be noted that under Georgia law, which applies in this diversity suit, Joiner need only show that his exposure to PCB's "'promoted'" his lung cancer, not that it was the sole cause of his cancer. Brief for Respondents 7, n. 16 (quoting Brief for Appellants in No. 94–9131 (CA11), pp. 7–10).

[9] The Court stated in *Daubert:* "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. . . . Additionally, in the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to

that the difference between methodology and conclusions is just as categorical as the distinction between means and ends, I do not think the statement that "conclusions and methodology are not entirely distinct from one another," *ante*, at 146, either is accurate or helps us answer the difficult admissibility question presented by this record.

In any event, it bears emphasis that the Court has not held that it would have been an abuse of discretion to admit the expert testimony. The very point of today's holding is that the abuse-of-discretion standard of review applies whether the district judge has excluded or admitted evidence. *Ante*, at 142. And nothing in either *Daubert* or the Federal Rules of Evidence requires a district judge to reject an expert's conclusions and keep them from the jury when they fit the facts of the case and are based on reliable scientific methodology.

Accordingly, while I join Parts I and II of the Court's opinion, I do not concur in the judgment or in Part III of its opinion.

---

allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment, Fed. Rule Civ. Proc. 50(a), and likewise to grant summary judgment, Fed. Rule Civ. Proc. 56. . . . These conventional devices, rather than wholesale exclusion under an uncompromising 'general acceptance' test, are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702." 509 U. S., at 596.