HARTZ, Circuit Judge,
dissenting:
I respectfully dissent. Dr. Teitelbaum’s theory of the causation of Plaintiffs injury lacks the scientific support necessary for it to be admissible at trial.
My conclusion is not a reflection on Dr. Teitelbaum’s expertise as a toxicologist. He has an impressive resume. But science is no respecter of resumes. An author’s resume may cause the scientist-reader to pay attention to the author’s theory; but it does quite little to cause the scientist to agree with the theory. Agreement depends upon trustworthy supporting data. Dr. Teitelbaum’s resume has not prevented his opinions from being properly excluded in other litigation. See General Electric Co. v. Joiner, 522 U.S. 186, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (affirming the district court’s refusal to admit into evidence Dr. Teitelbaum’s opinion regarding the cause of Mr. Joiner’s lung cancer).
Dr. Teitelbaum’s theory is that Plaintiff has suffered “mild diffuse [permanent brain] damage,” Aplt.’s App. at 356 ¶ 8, caused by high altitude cerebral edema (HACE) “of a mild nature.” Id. Dr. Teitelbaum does not purport to be an expert on HACE itself. He has conducted no personal research on HACE, and apparently had not even had prior patients with the condition. Moreover, he admits that if Plaintiff had HACE, his case was quite unusual, perhaps unique. One of his affidavits states: “I must point out that there will never be any epidemiological study which duplicates this extraordinary *1002 event which led to [Plaintiffs] injury. If we write a case report of this event it likely will be the only one in the litera-ture_” Id. at 345 ¶5. To justify his conclusions, Dr. Teitelbaum asserts that he is relying on well-established general principles and refers to numerous articles in the medical literature.
The majority opinion fails to take the correct approach. It makes good arguments that the medical literature cited by Defendant does not prove Dr. Teitelbaum’s opinion to be wrong. The test is not, however, whether Defendant can prove Dr. Teitelbaum’s opinion is wrong. The test is whether there is adequate scientific support for Dr. Teitelbaum’s opinion. Dr. Teitelbaum’s opinion may in fact be correct. It may be an inspired insight. But a courthouse is not the proper forum to present inspiration. Only when the insight is properly supported by research is it admissible at trial. See Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 319 (7th Cir.1996) (“[T]he courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it.”)
Determining whether an expert’s opinion rests on adequate scientific support can be a daunting task for a judge. Judges are not, and should not be, scientists. But neither must judges be passive aiders and abettors of hired guns who can pronounce their “wisdom” with such self-appointed authority that a layperson has little chance of resolving the muddle. The solution, albeit just a partial one, is to rely on opposing experts to point to the gaps in each other’s chain of reasoning. As the majority opinion properly states, “[T]he responsibility ultimately falls on th[e] challenging party to inform (via the record) those of us who are not experts on the subject with an understanding of precisely how and why the expert’s conclusions fail to follow from the data set.” Op. at 5. But when the challenging party satisfies this requirement and points out that the data set does not support the expert’s conclusion, the expert must then present a reasonable argument to the contrary. Otherwise, the court has no choice but to “conclude that there is simply too great an analytical gap between the data and the opinion proffered.” Joiner, 522 U.S. at 146, 118 S.Ct. 512. The majority of this panel believes that Defendant failed to satisfy its obligation to point out how the data fail to support Dr. Teitel-baum’s conclusion. My view, however, is that Defendant satisfied this obligation and Dr. Teitelbaum failed to respond adequately.
There are at least two major gaps in Dr. Teitelbaum’s analysis. As pointed out by Defendant’s experts, Dr. Teitelbaum has not produced adequate scientific support for the proposition that HACE of the nature allegedly experienced by Plaintiff can cause permanent brain damage of the type allegedly suffered by Plaintiff. And he has not produced adequate scientific support for the proposition that the episode in Moffat Tunnel could have caused HACE.
First, assuming that Plaintiff indeed suffered HACE, could his HACE have caused the brain damage allegedly present? Dr. Teitelbaum asserts that Plaintiff has mild diffuse permanent brain damage. But Dr. Neal L. Rosenberg, Defendant’s expert, stated in his affidavit that if Plaintiff “had suffered a permanent injury to the brain from [the tunnel] event, he would almost certainly have been rendered unconscious (or resulting in a coma), immediately at the time of the alleged exposure.” Aplt.’s App. at 581. Of course, the district court was not bound to reject Dr. Teitelbaum’s opinion just because another expert disagreed. Nevertheless; once the trial court was alerted to the potential gap in Dr. *1003 Teitelbaum’s chain of reasoning, it should not have admitted the expert’s opinion into evidence unless the record before the court — other than a bald ipse dixit from the expert, see Joiner, 522 U.S. at 146, 118 S.Ct. 512—filled that gap.
Dr. Teitelbaum’s testimony and affidavits contain no support for the proposition that Plaintiff could have suffered permanent brain injury from HACE without having lost consciousness during the episode. Indeed, Dr. Teitelbaum fails to address the issue. The closest he comes is in the following passage from one of his affidavits:
In Ward’s textbook, High Altitude Medicine and Physiology, Chapter 19 deals with high altitude cerebral edema. Defendants have confused increased in-tracranial pressure which results in local diffuse damage with malignant high altitude cerebral edema which causes ataxia, irrationality, hallucinations, clouding of consciousness and death. The syndrome suffered by Mr. Goebel was more severe than that suffered by the usual skier or tourist who reaches altitude, and less severe than that suffered by mountain climbers who have acute major irreversible damage. He suffered mild diffuse damage which in some individuals would be of little consequence and might not even be detected.
However, in a railroad engineer who is required to carry out complex mechanical and intellectual tasks, these residua are disabling. The failure of the defendants to review Ward’s textbook to which I referred in my affidavit and which deals with the fundamental physiology of oxygen and hemoglobin at high altitude has contributed substantially to the confusion set forth in their motion for new trial and in the course of their cross-examination of me.
Aplt.’s App. at 856. Chapter 19 of Ward’s text, however, says nothing about permanent brain damage, whether mild diffuse damage or otherwise. See Michael P. Ward, et al., High Altitude Medicine & Physiology, 412-17 (2d ed. 1995) (Ward). The three “[t]ypical cases” it describes resulted in either death or complete recovery. Id. at 413-14.
In an abundance of caution, I have reviewed the literature cited by Dr. Teitel-baum (as best I can as a layman, without the assistance of any references by Dr. Teitelbaum to specific pages or passages in the literature) to see whether it fills the gap. It does not. The literature reports that death is a common consequence of untreated HACE. Victims who survive, however, generally exhibit no signs of permanent injury. The case reports in Dr. Teitelbaum’s cited literature typically refer to full recovery of the victim. See Thomas E. Dietz, All About Altitude Illness, in High Altitude Medicine Guide 4, at htt p://www.high-altitude-medicine.com/ AMS.html (Dietz I) (“People with HACE ... usually recover completely”); Peter H. Hackett, et al., High-altitude Cerebral Edema Evaluated with Magnetic Resonance Imaging, 280 JAMA 1920, 1920 (1998) (Hackett I) (“all [nine] patients [with HACE] completely recovered”); Mark D. Harris, et al., High-Altitude Medicine, 57 Am. Fam. Physician 1907, 1911 (1998) (Harris) (“usually recover completely”); Phillip R. Yarnell, et al., High-Altitude Cerebral Edema (HACE): The Denver/Front Range Experience, 20 Seminars in Neurology 209, 216 (2000) (Yarnell) (HACE “is completely reversible with expeditious treatment”).
To be sure, one article cited by Dr. Teitelbaum says that persistence of “neu-rologic deficits,” while “extremely rare,” has been reported, Thomas E. Dietz, Altitude Illness Clinical Guide for Physicians, *1004 in High Altitude Medicine Guide 7, at http://www.high-altitude-medicine.conV AMS-medicaLhtml (Dietz II); and another article, contrary to every other statement on the subject in the cited articles, states that HACE “often resolves with longlast-ing neurologic and psychiatric deficits,” Michael Weidman & Geoffrey C. Tabin, Highr-Altitude Retinopathy and Altitude Sickness, 106 Ophthalmology 1924, 1926 (1999) (emphasis added). But neither of these two assertions (which, by the way, were not specifically referred to in Dr. Teitelbaum’s testimony or affidavits) is accompanied by any reference to authority, such as a journal article, for its truth. As a result, it is impossible to verify the assertions. More importantly, even assuming the truth of the assertions, the absence of supporting references makes it impossible to compare those victims’ experiences with HACE to Plaintiffs experience, to see whether, for example, the victims suffered permanent brain damage without having been rendered unconscious by HACE.
In sum, Dr. Teitelbaum’s literature provides no support for any person’s having suffered permanent brain injury — much less “mild diffuse damage”- — from a case of HACE that had not resulted in symptoms (such as coma) significantly more severe than those experienced by Plaintiff. We have no basis for assuming that the reports of permanent neurological damage referred to in Dr. Teitelbaum’s literature were related to cases of “mild HACE” (as Dr. Teitelbaum describes what happened to Plaintiff). On this ground alone, Dr. Teitelbaum’s opinion of the cause of Plaintiffs alleged brain injury has no business in a court of law.
The second gap in Dr. Teitelbaum’s opinion relates to the cause of HACE. Dr. Teitelbaum asserts that the tunnel episode, which lasted less than 60 minutes, caused Plaintiff to suffer HACE. Dr. Rosenberg, however, said in his affidavit: “HACE typically requires 1 to 3 days to develop ..., and I am unaware of a single case of HACE developed in less than 12 hours.” Aplt.’s App. at 608. Again, Dr. Teitelbaum does not confront this challenge. The closest he comes on this issue is the following passage in an affidavit:
Mr. Goebel’s transition in a short period of time from Denver’s altitude of approximately 5,280 feet to the Moffat Tunnel apex altitude of 9,200 feet is more than sufficient to produce both acute mountain sickness (AMS) and high altitude cerebral edema (HACE) in an individual who is both sensitive to the development of the disease and is exposed to factors in addition to the altitude stresses which contribute to the problem. I have discussed all of these stressors and toxicity issues in my prior declarations.
Aplt.’s App. at 251. He cites no literature to support the proposition that HACE could be caused during the brief period in the tunnel.
Again, in an abundance of caution I read the various articles attached to his affidavits. None of the articles comes close to suggesting that HACE can arise during a 60-minute episode of high-altitude hypoxia. In one article cited by Dr. Teitelbaum all nine reported cases of HACE occurred after the victim had spent two or more days at high altitude. Hackett I, supra, at 1922. In another, all 13 reported cases involved patients who had spent at least three days at high altitude. Yarnell, supra, at 212. Other articles cited by Dr. Teitelbaum contain the following statements: [1]
*1005 1. “The 6-to-96-hour delay between the arrival at a high altitude and the onset of symptoms.... ” George H. Sands, et al., Cough, Exertional & Other Miscellaneous Headaches, 75 Med. Clinics 733, 742 (1991) (Sands).
2. “Progression to HACE from mild AMS varies from 12 hours to the more common duration of between 1 and 3 days.” Committee to Advise on Tropical Medicine and Travel, Statement on High Altitude Illnesses, 24 Can. Communicable Disease Rep. 1, 8 (1998) (Canada Statement).
3. “AMS affects climbers 6 h[ours] to several days after an ascent to an altitude greater than 3,000 m [9800 feet].” Sarper Karakücük & G. Erutgral Mizra, Ophthalmological Effects of High-Altitude, 2000 Ophthalmic Res. 30, 31(1999).
4. HACE is assumed to occur with “severe prolonged hypoxia.” John W. Severinghaus, Hypothetical roles of an-giogenesis, osmotic swelling, and ische-mia in high-altitude cerebral edema, 79 J. Applied Physiology 375, 375 (1995) (Severinghaus I).
5. “Is the increase of CBF [cerebral blood flow] [from acute hypoxia] a causative factor in acute mountain siekness[?] This is highly unlikely. The increase in blood flow is almost instantaneous, while AMS, more specifically the headache, sets on only after hours.” N.A. Lassen, Increase of Cerebral Blood Flow at High Altitude: Its Possible Relation to AMS, 13 Int. J. Sports Med. 47, 48 (1992).
6. “[V]asogenic edema develops in humans (and sheep) who become moderately ill with AMS/HACE during 24 hr or more of hypoxic exposure.” Peter H. Hackett, The cerebral etiology of high-altitude cerebral edema and acute mountain sickness, 10 Wilderness & Envtl. Med. 97,106 (1999).
Dr. Teitelbaum may have been assuming that the severity of the hypoxia suffered by Plaintiff accounts for the quick onset. But the literature does not support such an assumption. According to the literature cited by Dr. Teitelbaum, HACE appears to be an indirect effect of prolonged hypoxia, which can be distinguished from direct effects of oxygen deprivation on the brain. See, e.g., Canada Statement, supra, at 2-3 (describing acute hypoxia and AMS as distinct ailments). Unlike what happens in AMS or HACE, “Acute severe hypoxia may, within minutes, induce headaches, nausea, and vomiting.” Severin-ghaus I, supra, at 377. As explained in another article, “AMS is now considered to be primarily due to the body’s response to modest hypoxia and has a different patho-physiology from simple acute hypoxia, being associated with fluid shifts not seen with hypoxia alone.” Canada Statement, supra, at 3. In noting the difference between HACE and the direct effects of oxygen deprivation, a third article said that “attempts to correlate AMS/HACE ... with the degree of hypoxemia[ ] has been relatively fruitless.... ” Peter H. Hackett, Hypoxia: Into the Next Millennium 25 (1999). And a fourth article concluded that “[t]he 6-to-96-hour delay between the arrival at a high altitude and the onset of symptoms suggests that hypoxia is not the immediate cause of AMS.” Sands, supra, at 742.[2]
*1006 Despite Dr. Teitelbaum’s failure to explain the uniquely rapid onset of Plaintiffs alleged HACE, the majority opinion makes an attempt. It asserts that we should look not just at the time in the tunnel but also should consider the entire train trip from Denver, which began at the high altitude of 5,280 feet. Op. at 20-22. This assertion, however, ignores the medical literature. The articles say, for example, that “[p]ractically speaking ..., we generally don’t worry about elevations below about 2500 m (8000 ft) since altitude sickness [much less HACE] rarely occurs lower than this.” Dietz I, supra, at 1. When one article says that “some susceptible individuals may experience symptoms of altitude-related illness beginning as low as 2500 m [8200 feet],” Canada Statement, supra, at 1 (emphasis added), I infer that conditions below 8200 feet simply do not induce AMS (much less HACE) in anyone. See also Yarnell, supra, at 211 (“In general, ... high-altitude illness [is] associated with rapid ascent above 8202 feet (2500 m).”). According to the literature, the mean altitude at which HACE develops is 15,500 feet in cases where, as here, the person does not also suffer high altitude pulmonary edema (HAPE). (For those who suffer HAPE, the mean altitude is 12,850 feet. Id. at 214.)
Furthermore, the cited articles report that acclimation to high altitude is the key to avoiding AMS and HACE. See Dietz II, supra, at 3 (“continued ascent is aceeptable” once one is free of AMS symptoms); Harris, supra, at 1907 (to avoid AMS, ascend only 1,000 feet per day after reaching 8,000 feet); Dietz I, supra, at 3 (above 10,000 feet one’s sleeping elevation should not increase more than 1,000 feet per night); Canada Statement, supra, at 6 (safest method to prevent AMS is “graded ascent”). And the higher one’s home altitude, the better one can adjust. See Yar-nell, supra, at 211 (odds of getting AMS are 3.5 times greater if usual residence is below 3,000 feet). Here, the first four hours of the trip were below 8,300 feet elevation and unlikely to create the conditions for HACE, or even AMS. Aso, Plaintiff would be less likely than most people to develop AMS at such an altitude because he was acclimated to the mile-high elevation of Denver, where he lived. Nor did Plaintiff experience any conditions before entering the tunnel that Dr. Teitel-baum said would exacerbate the hypoxia— exposure to thick diesel smoke, physical exertion, or use of a counterproductive respirator. In short, the majority opinion expands the time during which Plaintiff was exposed to high-altitude hypoxia by speculation not supported by, indeed contradicted by, the medical literature.
More importantly, the majority opinion’s speculation is not even supported by Dr. Teitelbaum’s own assertions. None of his opinions regarding the cause of Plaintiffs alleged HACE relies on Plaintiffs train trip up to the tunnel. Instead he focuses *1007 on the events in the tunnel. For example, his final affidavit states:
2.... The[ ] elements of causation are the altitude of the tunnel, the oxygen content of air at that altitude, the physiologic principles which govern the partial pressure of oxygen in the blood at that altitude, the presence of diesel fuel in [Plaintiffs] environment, the use of an inappropriate respirator, and the duration of the event.
3. In my opinion, the injury to [Plaintiff] was caused by an increase in intracranial pressure due to cerebral edema and a decreased oxygen supply to the brain which in turn were the result of the altitude of the tunnel, the oxygen content of the air, and the partial pressure of oxygen in the blood, combined with the exercise involved in his escape, the polluted atmosphere, and individual physiologic response of the patient.
Aplt’s App. at 344 (emphasis added). Dr. Teitelbaum makes no reference to the altitudes encountered by Plaintiff on the trip to the tunnel. I do not think we can rescue his opinion from the HACE-causation gap by relying on a highly suspect theory that not even he has embraced.
As Defendant put the matter in its opening brief: “Selecting only favorable factoids out of articles, without considering their overall conclusions, and without confronting or explaining why the unfavorable parts of the article have been rejected, is not science — it is simply advocacy. And that is exactly what Dr. Teitelbaum did.” Aplt.’s Br. at 29. I am afraid that description is accurate. I would reverse the district court’s decision to admit Dr. Teitelbaum’s testimony and order entry of judgment in favor of Defendant.

. Medical science is unsure how HACE develops, see John W. Severinghaus, Uses of High Altitude for Studies of Effects of Hypoxia, in *1006 Oxygen Transport to Tissue XX 17, 24 (1998) (“[t]he underlying pathophysiology of HACE ... is still poorly understood”). (This in itself renders unacceptably speculative Dr. Teitel-baum's theory that HACE could be caused by a combination of factors never before reported or, as far as one can tell, observed to accompany HACE.) Nevertheless, a brief description of one of the theories may help to understand how HACE can differ from the direct effects of hypoxia. One expert suggests that HACE is caused by angiogenesis — ”[t]he process by which growing ischemic or hypoxic tissues stimulate the in-growth of capillaries.” Severinghaus I, supra, at 377. This expert theorizes that HACE is observed upon the "onset of angiogenesis after hours or days [of hypoxia].” Id. at 378. "Angiogenic capillary breakdown and the resulting edema,” he says, "presumably occur only after many hours of sustained hypoxia.” Id. at 377; see Yarnell, supra, at 216 ("Angiogenesis is stimulated within hours of hypoxia.” (emphasis added.))