# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-IA-00831-SCT

*TREASURE BAY CORPORATION d/b/a*
*TREASURE BAY CASINO AND FIRE DOG, INC.*
*d/b/a ADVENTURES BAR AND GRILL*

*v.*

*SHEILA RICARD, INDIVIDUALLY, AND ON*
*BEHALF OF THE WRONGFUL DEATH*
*BENEFICIARIES OF PHILLIP ROBINSON,*
*DECEASED*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/10/2006 |
| TRIAL JUDGE: | HON. DALE HARKEY |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | WALTER WILLIAM DUKES |
| | JE'NELL BLOCHER GUSTAFSON |
| | CYNTHIA DIANNE BURNEY |
| | DONALD RAFFERTY |
| ATTORNEYS FOR APPELLEE: | TOM P. CALHOUN, III |
| | JACKYE C. BERTUCCI |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED AND REMANDED - 11/08/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.     This wrongful-death action alleges the defendants are liable for the wrongful death

of Phillip Robinson. The suit is brought by Sheila Ricard, individually and on behalf of

Robinson's statutory wrongful death beneficiaries, pursuant to Mississippi's Dram Shop Act,

Mississippi Code Annotated Section 63-3-73 (Rev. 2004). The defendants, Treasure Bay

Corporation d/b/a Treasure Bay Casino and Fire Dog, Inc. d/b/a Adventures Bar and Grill, filed motions for summary judgment which the trial court denied in an order without opinion. This Court granted the defendants' joint petition for interlocutory appeal to clarify several issues raised by the parties concerning summary judgment. We find that the trial court's denial of summary judgment was proper.

## BACKGROUND FACTS AND PROCEEDINGS

¶2. In the early morning hours of October 23, 2002, Joshua Dillmon was driving along Highway 90 in Ocean Springs when he struck and killed Robinson. Dillmon left the scene of the accident before police arrived, but returned less than an hour later. At approximately 6:41 a.m., Dillmon was administered an intoxilyzer test by police, which revealed his blood alcohol content (BAC) was 0.088%. Later that morning, Dillmon was given a blood test which indicated a BAC of 0.07%. Dillmon also gave an unsworn statement to police after being arrested.

¶3. Dillmon told police he had been awake since approximately 5 a.m. on October 22, 2002, to get ready to be at work at 6 a.m. Dillmon worked that day until approximately 3 p.m. That night, he went to the Pirate's Den, a bar inside the Treasure Bay Casino, at approximately 10 p.m.[1] Dillmon stated that he drank four or five beers and left the Pirate's Den at approximately 11:30 p.m.

¶4. He then drove from Treasure Bay to Adventures. He claims that, while at Adventures, he consumed three beers before leaving at approximately 3:30 a.m. Dillmon said that he then drove to Casino Magic, where he ate a hamburger but had nothing else to drink. He stated

---

[1]The Pirate's Den is owned and operated by Treasure Bay.

2

that he knew he should not have driven from Adventures to Casino Magic but that he was hungry and needed to sober up.

¶5. Next, Dillmon left Casino Magic and traveled eastbound on Highway 90 at roughly 45 miles per hour. When he approached the intersection of Martin Luther King and Highway 90, he said that he looked down for two or three seconds to change the radio station as he went through the intersection. While passing through the intersection, he hit something that he thought was a construction barrel. After the collision, Dillmon pulled over into a parking lot approximately one-half mile away and stayed there for around one hour before returning to the scene. Upon returning and being administered the intoxilyzer test, Dillmon was arrested.

¶6. After filing suit against Treasure Bay and Adventures, Ricard deposed two Pirate's Den employees and three Adventures employees who worked during the time Dillmon claimed he was a patron at these establishments. None of the employees knew Dillmon or remembered serving Dillmon during the times in question.

¶7. Dr. Steven Hayne, Ricard's expert, provided an affidavit in which he opined that Dillmon would have been visibly intoxicated when he was served alcohol at the Pirate's Den and Adventures. When deposed by the defendants, Dr. Hayne confirmed his opinion that Dillmon was visibly intoxicated when he was served alcohol at the Pirate's Den and Adventures. Dr. Hayne testified that he was qualified to give his opinions concerning visible intoxication because he was board certified in anatomic pathology, forensic pathology, and forensic medicine. He held himself out as an expert in the interpretation of the effects of ethyl alcohol in human beings. Dr. Hayne based his opinions on Dillmon's intoxilyzer

3

results indicating a BAC of 0.088%, his blood sample indicating a BAC of 0.07% and his statement to police.

¶8.    In forming his opinion, Dr. Hayne accepted Dillmon's statement that he drank no alcoholic beverages after leaving Adventures, but rejected Dillmon's claim that he consumed only seven or eight beers between 10:30 p.m. and 3:30 a.m.  Dr. Hayne opined that, if Dillmon were telling the truth about the amount of alcohol he consumed, he would have had a BAC of 0.00% when the intoxilyzer test was administered at 6:41 a.m.  Dr. Hayne opined that because the intoxilyzer test administered to Dillmon at 6:41 a.m. revealed that his BAC was 0.088%, his blood alcohol content earlier would have reached a level of 0.14% to 0.15%. Such high levels of BAC, according to Dr. Hayne, could not be produced with seven or eight beers, and would have rendered Dillmon visibly intoxicated.

¶9.    After the incident, Dillmon was indicted for manslaughter, and has refused to testify in this civil proceeding, claiming the privilege against self-incrimination granted to him under the Fifth Amendment to the United States Constitution.  Ricard relies exclusively on Dr. Hayne's testimony in arguing the existence of a triable issue of material fact.  Both defendants claim they are entitled to summary judgment because Ricard has failed even to establish that Dillmon was present and drinking at their respective bars.

## DISCUSSION

### I.

¶10.    This Court reviews denials of summary judgment de novo.  *Davis v. Hoss*, 869 So. 2d 397, 401 (Miss. 2004).  Summary judgment is granted "if the pleadings, depositions and answers to interrogatories and admissions on file, together with the affidavits, if any, show

there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." M.R.C.P. 56(c). The evidence must be viewed in the light most favorable to the nonmoving party. ***Flores v. Elmer***, 938 So. 2d 824, 826 (Miss. 2006).

¶11. Ricard's suit against Treasure Bay and Adventures was brought pursuant to Mississippi's Dram Shop Act. Miss. Code Ann. § 67-3-73 (Rev. 2004). Therefore, the claim must be analyzed under the statute. The Act provides limited immunity for those selling or furnishing intoxicating beverages and states, in pertinent part:

> (1) The Mississippi Legislature finds and declares that the consumption of intoxicating beverages, rather than the sale or serving or furnishing of such beverages, is the proximate cause of any injury, including death and property damage, inflicted by an intoxicated person upon himself or another person.
> (2) Notwithstanding any other law to the contrary, no holder of an alcoholic beverage, beer or light wine permit, or any agent or employee of such holder, who lawfully sells or serves intoxicating beverages to a person who may lawfully purchase such intoxicating beverages, shall be liable to such person or to the estate or survivors of either, for any injury suffered off the licensed premises, including wrongful death and property damage, because of the intoxication of the person to whom the intoxicating beverages were sold or served.

Miss. Code Ann. § 67-3-73(1)-(2) (Rev. 2004).

¶12. The Act also creates a cause of action for those injured by someone who has been served intoxicating beverages while visibly intoxicated, stating:

> the limitation of liability provided by this section shall not apply to any person who causes or contributes to the consumption of alcoholic beverages by force or by falsely representing that a beverage contains no alcohol, or to any holder of an alcoholic beverage, beer or light wine permit, or any agent or employee of such holder when it is shown that the person making a purchase of an alcoholic beverage was at the time of such purchase visibly intoxicated.

Miss. Code Ann. § 67-3-73(4) (Rev. 2004).

5

¶13.    When analyzing the facts of this case under the statute, the trial judge properly denied the defendants' motions for summary judgment. Ricard has presented sufficient evidence to create a genuine issue of material fact as to whether Dillmon was served alcohol by Adventures while he was visibly intoxicated. Accordingly, the trial court's denial of summary judgment as to Adventures is affirmed. However, Ricard has provided insufficient evidence to create any genuine issues of material facts as to Treasure Bay. Nevertheless, because the plaintiff filed a Rule 56(f) motion stating that she cannot obtain needed testimony, the denial of summary judgment as to Treasure Bay also is affirmed.

## II.

*Expert opinions – credibility versus reliability.*

¶14.    To be consistent with the rule of law, this Court may not reject an expert's opinion simply because the opinion is based in part on a statement of fact which the Court does not find credible. This Court must not invade the fact-finder's province, and should not use the concepts of credibility and reliability interchangeably.

¶15.    To determine whether summary judgment was appropriate, the precise issue is whether the record, when viewed in the light most favorable to Ricard, indicates that Treasure Bay and Adventures sold alcoholic beverages to Dillmon when he was "visibly intoxicated." *See* Miss. Code Ann. § 67-3-73 (4). As to Adventures, the record clearly contains such evidence.

¶16.    Dillmon told the police he dank alcoholic beverages at Treasure Bay's casino and bar from 10 p.m. until 11:30 p.m. and then drank additional alcoholic beverages at Adventures from shortly after 11:30 p.m. until about 3 a.m. Dillmon further stated that he consumed no

6

alcoholic beverages after leaving Adventures.  The accident took place between 5:14 a.m., and 5:44 a.m.[2] Dr. Hayne testified that, given Dillmon's statement to police,

> he would have exhibited significant signs of visible intoxication including, but not limited to, marked alteration as to orientation of time, person and place, mentations, emotional stability, light reflex and motor coordination.  One would expect significant loss of self control with impairment of judgment. One would expect to see impairment as to ability to ambulate or maintain balance and one would also expect to see diminished mentation in the performance of relatively simple tasks.  The ability to perform a fine motor skill task would be rendered essentially highly diminished if not impossible. The ability of an individual such as Dillmon to perform a standard task with such an elevated ethyl alcohol level would be markedly impaired.
>     I am of the opinion that any individual skilled or trained in the observation and monitoring of such signs of visible intoxication with minimal skill, and exercising should have recognized the significance of impairment exhibited by Mr. Dillmon secondary to his ethyl alcohol intoxication on the night and early morning in question.

¶17.   There can be no dispute that, if Dr. Hayne's testimony is considered, summary judgment is inappropriate as to Adventures.  The defendants argue that the trial court improperly relied on Dr. Hayne's opinion because it was partially based upon a statement by Dillmon, which, according to the defendants, lacks credibility.  The defendants do not doubt Dillmon made the statement; they simply don't believe it was truthful.   Indeed, experts in many fields, including medicine, accident reconstruction and forensic pathology, frequently rely on histories provided by patients and witnesses.  Thus, it would be unsettling for this Court abruptly to reject all expert opinion which relies on a historical account of the facts. Of course, whether or not the facts relied upon are credible is a matter for cross-examination and collateral attack at trial.

_____

[2]There is a factual dispute as to the time of the accident.  At the summary judgment hearing, the attorneys represented that the accident occurred at 5:14 a.m. which, if true, would be more favorable to Ricard.

¶18. After a diligent search, this Court has been unable to locate a single decision from this jurisdiction or any other which holds that, to render an opinion, an expert must accept as true a witness's entire statement. The truthfulness of a particular factual representation is a matter of credibility. Credibility is a question of fact that must be decided by the jury. ***Cousar v. State***, 855 So. 2d 993, 997 (Miss. 2003). Evidence (including its credibility) must be viewed in favor of the non-moving party. ***Northern Elec. Co. v. Phillips***, 660 So. 2d 1278, 1281 (Miss. 1995). Thus, for the limited purpose of reviewing the trial court's denial of summary judgment, this Court accepts as true the statements made by Dillmon which are favorable to Ricard, and rejects those which are not, and this Court will not (for summary judgment purposes) reject Dr. Hayne's opinions, simply because they rely on statements, the truth of which the defendant questions.

### III.

¶19. This Court adopted the ***Daubert*** standard for the admission of expert testimony in Mississippi. *See **Daubert v. Merrell Dow Pharm., Inc***., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). The Federal Rules of Evidence, including Rule 702 which addresses expert-opinion testimony, were adopted in 1975. The version of Federal Rule 702, in effect in 1993, the year ***Daubert*** was decided, stated:

> If scientific, technical, or other specialized testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702. In construing and applying Rule 702, the United States Supreme Court held that, when a party offers scientific, expert opinion, the courts must serve as

8

"gatekeeper," to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id*. at 2795. Having announced the importance of a finding of reliability, the Court offered certain indicators of reliability which should be considered. These include whether the theory can be tested, whether it has been subjected to peer review, the error rate, and the general acceptance of the theory. *Id*. at 2796-97.

¶20. Early interpretations of Rule 702 focused on scientific theory. However, in the late 1990s, the United States Supreme Court expanded its *Daubert* analysis to include a closer look at the reasoning employed by the expert in reaching conclusions and opinions to be offered at trial. *See e.g.* ***General Electric Co. v. Joiner***, 522 U.S. 136 (1997); ***Kumho Tire Ltd. v. Carmichael***, 526 U.S. 137 (1999). Although these opinions closely scrutinize expert methodology, they neither address nor require any finding of credibility.

¶21. As a result of, and in order to comply with, these Supreme Court opinions, the Federal Rules of Evidence were modified in 2000. The new version of the rule states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The language of this new version of Rule 702 focuses on the reliability of the expert's methods and data, but makes no mention of the credibility of statements relied upon by experts who are following an accepted methodology.

¶22. By its 2003 amendment to Mississippi Rules of Evidence 702, this Court adopted the ***Daubert*** standard, and established the "gate keeping responsibility of the trial court to

9

determine whether . . . expert testimony is relevant and reliable." Comment, Miss. R. Evid 702. Neither the rule nor its comment mentions any requirement that statements relied upon by an expert using proper, reliable,  methodology also be found credible.

¶23.    To illustrate this Court's position, suppose on a patient's first visit to a doctor, the patient provided a history which included a claim that the patient had experienced back pain on a daily basis for more than a year.  Further suppose that, although the patient told the doctor the severity of the pain prevented the patient from working, the patient was observed water skiing and playing golf.  Finally, suppose that, based on the history of back pain, the doctor diagnosed the patient with nerve impairment.  Under such circumstances, this Court would not hold that a trial court was justified in refusing to allow the doctor to testify as an expert.

¶24.    An expert's methodology must be reliable.  To examine the reliability of an expert's opinions and methods, we have held that courts must examine factors including:

> whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Miss. Transport Comm'n v. McLemore*, 863 So. 2d 31, 37 (Miss. 2003).

¶25.    While the factors listed above are not exhaustive, this Court never has held that for an expert's opinion to be reliable, it must rely on a statement that is truthful in its entirety. No evidence has been presented that the plaintiff's expert relied upon facts, data, or procedures that are not generally accepted in the scientific community. *Hughes v. State*, 892

So. 2d 203, 210 (Miss. 2004). Indeed, the defendants do not argue that Dr. Hayne used an inappropriate or unreliable methodology–the current standard for exclusion under ***Daubert***.

*Adventures*

¶26.    A factual basis exists for Dr. Hayne's opinion that Dillmon was visibly intoxicated while at Adventures. When the testimony is viewed in the light most favorable to the plaintiff, Dr. Hayne could accept the statement that Dillmon did not drink alcohol after leaving Adventures and thus, must have consumed enough alcohol prior to leaving Adventures to cause his blood alcohol content to register 0.088% hours later. Dillmon's consumption of alcohol prior to leaving Adventures would have, in Dr. Hayne's opinion, caused Dillmon to appear visibly intoxicated while at Adventures. Thus, if Dr. Hayne's opinion is to be believed, Adventures served Dillmon alcohol at a time when he was visibly intoxicated.

¶27.    Dr. Hayne's methodology was not challenged as improper, unreliable or unacceptable in the medical community in the record. Thus, his testimony was sufficient to present a material issue of triable fact as to whether Adventures is liable.

*Treasure Bay*

¶28.    Because Dr. Hayne accepted that Dillmon did not continue to drink after leaving Adventures, he may fairly draw the conclusion that Dillmon took his last drink at Adventures. Thus, Dr. Hayne rendered an opinion that when Dillmon ended his drinking at Adventures, he was visibly intoxicated. The same cannot be said, however, for Treasure Bay. While Dr. Hayne may accept as true parts of Dillmon's statement and reject others, he may not assume facts not supported by the record. We find no factual basis for Dr. Hayne's

11

opinion that Treasure Bay served Dillmon alcohol while he was visibly intoxicated. Because

Dillmon continued to drink after leaving Treasure Bay, Dr. Hayne has no basis for opining

as to Dillmon's level of intoxication at the time he left Treasure Bay.[3]

¶29.    Dillmon testified that he drank only a few beers while at Treasure Bay and that he did

not consume alcohol before arriving at Treasure Bay.  Nothing in the record indicates that

Dillmon was visibly intoxicated when he left Treasure Bay to go to Adventures.  Therefore,

Dr. Hayne's opinion that Dillmon was visibly intoxicated while at Treasure Bay is not based

upon the facts and is therefore unreliable.  Nevertheless, summary judgment as to Treasure

Bay is inappropriate because, as discussed below, the plaintiff has not been given a fair

opportunity to complete discovery.

**IV.**

¶30.    Ricard made several good-faith efforts to obtain testimony from Dillmon.  Unable to

do so, she filed a motion pursuant to Rule 56(f), which provides:

> Should it appear from the affidavits of a party opposing the motion that he
> cannot for reasons stated present by affidavit facts essential to justify his
> opposition, the court may refuse the application for judgment or may order a
> continuance to permit affidavits to be obtained or depositions to be taken or
> discovery to be had or may make such order as is just.

M.R.C.P. 56(f).  Relying on his Fifth Amendment right not to make self-incriminating

statements, Dillmon continually claimed he would not testify.  Ricard asked the trial court

to withhold summary judgment until Dillmon could be deposed.  In its order denying the

---

[3]The same cannot be said for Adventures.  According to Dillmon's statement, he did not drink after leaving Adventures.  Thus, when he was served his last alcoholic beverage of the night at Adventures, his BAC (according to Dr. Hayne) was so high that he must have appeared visibly intoxicated.  Dr. Hayne had no way to calculate Dillmon's BAC when he left Treasure Bay and went to Adventures to continue to drink.

defendants' motions for summary judgment, the trial court did not address the Rule 56(f) motion.

¶31.  Although Ricard did not produce affidavits explaining why she was unable to produce Dillmon's testimony, this Court has held that the need for additional discovery may be presented by Rule 56(f) motion. ***Prescott v. Leaf River Forest Prods.***, 740 So. 2d 301, 307 (Miss. 1999).

¶32.  The plaintiff demonstrated that she was unable to produce Dillmon's affidavit because, on numerous occasions, he claimed that – as to any question other than his name – he would invoke his Fifth Amendment privilege against self-incrimination.  At the hearing on the motion for summary judgment, the plaintiff explained Dillmon's unavailability for deposition and requested that his deposition be conducted in the presence of the court. Although the trial court took the request under advisement, it ultimately denied summary judgment without opinion.  Thus, we do not know whether the trial court resolved plaintiff's Rule 56(f) motion one way or the other.

¶33.  The numerous attempts to secure Dillmon's deposition after his criminal trial repeatedly was postponed demonstrate the diligence required by the party seeking to avoid summary judgment under Rule 56(f).  In addition, Dillmon's testimony would allow the court to determine whether issues of fact remain regarding whether the defendants, specifically Treasure Bay, served Dillmon alcohol while he was visibly intoxicated. The importance of this testimony, coupled with the diligence demonstrated by the plaintiff in obtaining the testimony, demonstrate a valid, good-faith reason for further discovery.

*Civil application of the Fifth Amendment privilege*

13

¶34. Finally, the request that Dillmon's deposition be taken in the presence of the court demonstrates additional good faith on the part of the plaintiff. A deposition before the court would avoid any delay that could result if Dillmon improperly invokes his Fifth Amendment privilege. The civil application of the Fifth Amendment privilege is not as broad as in the criminal context. *In re Knapp*, 536 So. 2d 1330, 1334-5 (Miss. 1988). The privilege against self-incrimination in a civil case must be applied on a question-by-question basis. *Id*. at 1334. When determining whether an individual must answer a specific question, the court must apply a two-step test. *Id*. "First, the Court must determine whether the answers to the questions might reveal that the witness in engaged in criminal activity. The witness must answer if the answer would not be incriminatory." *Id*. "Second, if the answers might incriminate, the court must the determine whether there is a more remote risk that the witness will be prosecuted for the criminal activities." *Id*.

¶35. To avoid answering the question of whether he was at Treasure Bay or Adventures on the night in question, Dillmon would be required to demonstrate to the trial court how his answer might incriminate him.

## CONCLUSION

¶36. Because Ricard has presented evidence establishing genuine issues of material fact concerning whether Dillmon was served alcoholic beverages while visibly intoxicated at Adventures; and because Ricard properly filed a Rule 56(f) motion and is entitled to further discovery concerning Dillmon's testimony, the trial court's denial of summary judgment is affirmed and this case is remanded for further proceedings consistent with this opinion.

¶37. **AFFIRMED AND REMANDED**.

14

**SMITH, C.J., WALLER AND DIAZ, P.JJ., EASLEY, CARLSON, RANDOLPH AND LAMAR, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY**.