In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-06-444 CV


____________________



JOSEPH GAUDETTE, JOYCE GAUDETTE, individually and 


as next friend for ANDREW WILKES, AUDREY GAUDETTE,


and AUSTEN GAUDETTE, Appellants



V.



CONN APPLIANCES, INC., Appellee






On Appeal from the 172nd District Court


Jefferson County, Texas


Trial Cause No. E-166-259






MEMORANDUM OPINION


 Plaintiffs Joseph Gaudette, Joyce Gaudette, individually and as next friend for Andrew
Wilkes, Audrey Gaudette, and Austen Gaudette, sued Conn Appliances, Inc. for harm to their
pulmonary, nervous, immune, digestive, and other systems from toxic mold and fungi,
alleging Conn Appliances' negligently installed a refrigerator in plaintiffs' home. Conn
Appliances filed a motion to exclude expert witness Dr. Andrew Campbell's testimony under
Rule 702 of the Texas Rules of Evidence. The trial court granted the motion. Conn
Appliances then filed a traditional and no-evidence motion for summary judgment. The
plaintiffs appeal the trial court's orders excluding Campbell's testimony and granting final
summary judgment. We affirm.

Exclusion of Campbell's Testimony

 At the hearing on the motion to exclude Campbell's testimony, Dr. Campbell (1) testified
he began treating the appellants in 2001 for complaints of headaches, memory loss, sleep
disturbance, fatigue, and infections. He took a medical history of the family and was told
that the family members "almost simultaneously . . . developed medical problems." He
testified at the hearing that he diagnosed the mother, Joyce, with chronic inflammatory
demyelinating polyneuropathy (CIDP), and the daughter, Audrey, with the "[s]ame thing 
. . . demyelinating polyneuropathy." He did not prove any specific diagnoses for Joseph,
Austen, and Andrew, but stated that their immune systems were "off." (2) He concluded their
symptoms resulted from molds in their home. Specifically, his diagnoses of appellants were
premised on his theory that their illnesses resulted from indoor exposure to mycotoxins. 

 Conn Appliances' motion to exclude Campbell's testimony asserts that Dr.
Campbell's diagnoses of mold-related autoimmune and/or neuropathic problems were "junk
science" and that there is no scientific or medical evidence to support Campbell's theory that
exposure to mycotoxins in an indoor environment is capable of causing any immunologic or
neurologic health effects. The trial court granted Conn Appliances' motion to exclude
Campbell's testimony under Rule 702. 

Standard of Review and Reliability under Rule 702

 An expert witness may testify regarding "scientific, technical, or other specialized"
matters if the expert is qualified and if the expert's opinion is relevant and based on a reliable
foundation. Tex. R. Evid. 702; Helena Chem. Co. v. Wilkins, 47 S.W.3d 486, 499 (Tex.
2001); E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 556 (Tex. 1995). In
determining whether expert testimony is reliable, a court must examine "the principles,
research, and methodology underlying an expert's conclusions." Exxon Pipeline Co. v.
Zwahr, 88 S.W.3d 623, 629 (Tex. 2002). If the testimony involves scientific knowledge, the
expert's conclusions must be "grounded 'in the methods and procedures of science,'" or
otherwise is "no more than 'subjective belief or unsupported speculation.'" Robinson, 923
S.W.2d at 557 (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 590 113 S.Ct.
2786, 125 L.Ed. 2d 469 (1993)). 

 In determining the reliability of expert testimony involving scientific knowledge, a
trial court should consider several non-exclusive factors: (1) the extent to which the theory
has been or can be tested; (2) the extent to which the technique relies upon the subjective
interpretation of the expert; (3) whether the theory has been subjected to peer review and/or
publication; (4) the technique's potential rate of error; (5) whether the underlying theory or
technique has been generally accepted as valid by the relevant scientific community; and (6)
the non-judicial uses that have been made of the theory or technique. Robinson, 923 S.W.2d
at 557. 

 Toxic tort cases require proof of both general and specific causation about the effects
of the toxic substance. Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 714-15, 720
(Tex. 1997). "General causation is whether a substance is capable of causing a particular
injury or condition in the general population, while specific causation is whether a substance
caused a particular individual's injury." Id. General causation may be proved either through
experiments to show that a substance is capable of causing a particular injury or by
attempting to show that exposure to a substance increases the risk of a particular injury. Id.
at 714-15. The Robinson factors may be applied in toxic tort cases involving a no evidence
claim such as the claim brought here by Conn Appliances. See id. at 714.

 A trial court has broad discretion in determining whether expert testimony is
admissible. Zwahr, 88 S.W.3d at 629. A trial court's ruling on the admissibility of an
expert's testimony will be reversed only upon an abuse of discretion. K-Mart Corp. v.
Honeycutt, 24 S.W.3d 357, 360 (Tex. 2000). A trial court abuses its discretion when its
decision is arbitrary or unreasonable or acts without reference to any guiding rules or
principles. Id. A reviewing court cannot conclude that a trial court abused its discretion
merely because, in the same circumstances, the reviewing court would have ruled differently
or because the trial court committed a mere error in judgment. Robinson, 923 S.W.2d at 558.

 The trial court's order excluding Dr. Campbell's testimony concluded that Campbell's
theories, opinions, and analysis have not been sufficiently tested; Campbell's diagnosis of
causation and conclusions have not been sufficiently tested; Campbell's diagnosis of
causation and conclusions as to the Plaintiffs is subjective; Campbell's diagnoses made of
the Plaintiffs or his causation conclusion are not supported by sufficient peer reviews; and
"that the evidence does not demonstrate a theory of causation that is generally accepted in
the scientific and medical communities." In other words, the trial court relied on Robinson
factors 1, 2, 3, and 5 in excluding Campbell's testimony. See id.

 Appellants argue on appeal that Dr. Campbell's testimony should not have been
excluded by the trial court because, on the issue of "reliability," his testimony satisfied
Robinson. Specifically, appellants argue that the trial court's decision to exclude Campbell's
testimony was based on the issue of general acceptance, which is only one of the six non-exclusive factors for the court to consider. Appellants assert the court failed to consider the
non-judicial uses of Campbell's theories and the publication of his theories in peer-reviewed
literature. 

 A trial court should consider the Robinson factors "when doing so will be helpful in
determining reliability of an expert's testimony, regardless of whether the testimony is
scientific in nature or experienced-based." Mack Trucks, Inc. v. Tamez, 206 S.W.3d 572, 579
(Tex. 2006). Although appellants argue in their reply brief that Gammill, which addresses
the admissibility of experts who are not in a scientific field or are professionals (3)
, is the
appropriate test for reliability of Campbell's testimony, we find the trial court acted within
its discretion in measuring the reliability of Campbell's testimony by considering the
Robinson factors. See id. ("A significant part of the trial court's gatekeeper function is to
evaluate the expert's qualifications, listen to the testimony, view the evidence, and determine
which factors and evaluation methodology are most appropriate to apply." ). We now turn
to the evidence presented to the trial court as to each of the Robinson factors to determine
whether the trial court abused its discretion in excluding Campbell's testimony. 

The Robinson Factors


The Extent to Which the Theory Has Been or Can Be Tested


 Conn Appliances argues there is no general causation and that Campbell's diagnoses
here are immaterial because of the absence of medical evidence that indoor inhalation
exposure to mycotoxins is capable of causing any toxic conditions in humans. Conn
Appliances maintains that Campbell's "diagnoses of mold related autoimmune/neuropathic
disorders [have] been roundly rejected by every major medical and governmental group that
has examined the . . . issue over the last five years, including: the National Academy of
Sciences; the Institute of Medicine; Center for Disease Control and Prevention (CDC);
National Institute of Occupational Safety and Health (NIOSH); American Academy of
Allergist & Immunologists; American College of Occupational and Environmental Medicine;
Texas Medical Association's Council on Scientific Affairs; and, most recently the Texas
Medical Association in 2006." 

 Conn Appliances attached to its motion the following recent literature in support of
its argument that there is no medical evidence that indoor inhalation exposure to mycotoxins
is cable of causing any toxic conditions in humans: 

 (1) an American Academy of Allergist and Immunologists position
paper published in the Journal of Allergy and Clinical Immunology for
February 2006 addressing the issue of mold-induced immune dysfunction
concluding that: (a) "[t]here is . . . no reliable evidence for mold exposure in
any setting being a [sic] linked to the induction of autoimmune diseases in
human subjects[;]" (b) "[e]xposure to molds and their products does not induce
a state of immune dysregulation (eg, immunodeficiency or autoimmunity)[;]"
and (c) "[t]he occurrence of mold-related toxicity (mycotoxicosis) from
exposure to inhaled mycotoxins in nonoccupational settings is not supported
by the current data, and its occurrence is improbable." 


 (2) a study by scientists from NIOSH and the CDC published in the
Annals of Allergy, Asthma, & Immunology for May 2004, entitled, "Clinical
use of immunoassays in assessing exposure to fungi and potential health
effects related to fungal exposure[,]" which states that "[r]ecent reviews of the
literature specifically addressing concerns about health effects related to
mycotoxins have concluded that there is as of yet no compelling scientific
evidence linking exposure to fungi in residential or commercial indoor
environments to toxin-induced adverse health effects." 


 (3) a report in the January 2003 issue of Clinical Microbiology Reviews
noting that: (a) "despite many reported subjective complaints, there is no
objective evidence for neurological compromise caused by indoor mold
exposure" and (b) "to date there is no good evidence of significant
immunological compromise from inhaled fungal toxins." 


 (4) a peer-reviewed policy statement issued October 27, 2002, by the
American College of Occupational and Environmental Medicine concluding
that "[c]urrent scientific evidence does not support the proposition that human
health has been adversely affected by inhaled mycotoxins in home, school, or
office environments." 


 (5) a Texas Medical Association's Council on Scientific Affairs policy
paper on Black Mold and Human Illness from September 2002, which
concluded that (a) "the proposition that molds in indoor environments may
lead to adverse health effects through mechanisms other than infection and
allergic/immunologic reactions is an untested impression" and (b) "[a]dverse
health effects from inhalation of Stachybotrys spores in water-damaged
buildings is not supported by available peer-reviewed reports in medical
literature." 


 (6) the Texas Medical Association's "Review of 'Damp Indoor Spaces
and Health' Reported by the Institute of Medicine May 2004," last published
in May 2005, finding that "there is no significant clinical evidence that humans
have adverse effects of immunotoxic, neurologic, respiratory or dermal
responses after exposure to mold other than allergic reactions and that, in the
clinical medical field, there is no known dose-response relationship between
a specific ambient concentration and any toxic human health effect." 


The Extent to Which the Technique Relies Upon the Subjective Interpretation of the Expert

 Appellants contend Campbell's underlying data for his diagnoses of mycotoxin-related illnesses in this case are: (1) a laboratory report based upon swab samples taken by
the company appellants hired for remediation of their home, (2) immunoassay tests for
mycotoxin antibodies conducted by Immunosciences Lab, Inc. ("ISL") and (3) his clinical
examination and neurophysiological testing of appellants. The report generated from the
remediation company fails to identify any particular species of mold, but concludes the home
has only the presence of "a black mold resembling Aspergillus niger" and a mold
"resembling Fusarium species[,]" and the report fails to quantify any mold found. Campbell
admitted under oath that the report did not actually identify which molds were present in
appellants' house or the amount present. As for the ISL immunoassay tests, the trial court
granted Conn Appliances' motion to exclude testimony or evidence based on these tests after
hearing Conn Appliances' evidence that there is no valid scientific basis for ISL's
immmunoassay tests as a diagnostic tool for mold-related health problems, and appellants
do not challenge that order on appeal. (4) 

 As for his clinical examination and neurophysiological testing of appellants, Campbell
chose to utilize his own methods instead of established diagnosing criteria. Campbell
acknowledged during his deposition that there is no specific criteria established for
diagnosing immune dysfunction. He also admitted that although there is a published standard
for diagnosing CIDP, he "use[s] basically [his] clinical judgment from the information [he
is] able to obtain." Conn Appliances attached to its motion an affidavit of Daniel Sudakin,
board certified in medical toxicology, public health, and general preventative medicine and
Assistant Professor of the Department of Environmental and Molecular Toxicology at
Oregon State University. In the affidavit, Sudakin states that when a physician uses clinical
laboratory tests to determine an individual's exposure to a chemical, the generally accepted
method is not to rely on immunoassay tests which do not measure mycotoxins at all, but to
directly measure that chemical in body fluids or tissues through techniques, such as
chromatography and mass spectrometry, to "directly detect and quantify the specific chemical
that is being investigated." 

 Appellants argue Campbell's testimony is objective because his examinations and
assessments (including myelin protein antibody testing, assessment of cranial nerves, bulk
muscle and power assessment, assessment of peripheral sensation, neurological gait
assessment, opthalmological assessment, and assessment of deep tendon reflexes) were
performed as appellants' treating physician and not in preparation for litigation. Appellants
also maintain Campbell's assessments were guided by data and information derived from his
own research and were ultimately published in peer-reviewed publications. Whether the Theory has Been Subjected to Peer Review and/or Publication and Whether
the Underlying Theory or Technique has been Generally Accepted as Valid by the
Relevant Scientific Community 


 In addition to the numerous documents Conn Appliances presented to the trial court
discrediting Campbell's diagnoses based on exposure to mold, Conn Appliance also attached
depositions of several physicians, including that of Dr. Timothy Lotze. Dr. Lotze is an
assistant professor of pediatrics and neurology at Baylor College of Medicine, clinical staff
member in the child neurology section at Texas Children's Hospital in Houston, and is board
certified in pediatrics and neurology. He testified that he found no peer-reviewed medical
articles associating Campbell's specific diagnoses of appellants with mold exposure. 

 Dr. William A. Fawcett also testified. He is a board certified allergist/immunologist,
former chair of the Asthma and Allergy Research Advisory Committee for the State of
Texas, former member of the education and research board of trustees of the American
Academy of Allergy, Asthma & Immunology, and former member of the grants and review
committee for the American Academy of Allergy, Asthma & Immunology. Dr. Fawcett
testified that from his review of molds and human illness that he has not seen any
neurological damage "in the typical exposure that human beings would have[.]" 
Furthermore, when asked whether he has ever seen anyone with mold exposure have an
autoimmune disease that caused demyelination or attacking of myelin sheaths of neurons, he
answered, "I clearly have not seen it, nor have I seen any credible literature that would
suggest or indicate that." 

 Dr. Howard S. Derman, board certified neurologist and associate professor of
neurology at Cornell and the Neurologic Institute in Houston, testified in this case that
"there's no evidence whatsoever in the neurologic literature, no evidence, that mold causes
any problem with the peripheral nervous system or with the nervous system." 

 The trial court also heard evidence regarding the Texas Medical Board's 2006 second
amended complaint against Campbell. The charges brought by the Texas Medical Board are
based upon the same type of mold-related diagnoses as in this case and included these,
among numerous other, charges:

 A. On each and every patient herein, [Campbell] has relied on junk science
to support his medical diagnosis and treatment of illnesses allegedly
attributable to mold exposure. [Campbell]'s reliance on junk science in
making medical diagnosis, treatment and decisions is below the
standard of care. [Campbell]'s position on mold exposure is contrary to
the nationally recognized positions of medical and health organizations
including, the Texas Medical Association (TMA), Center for Disease
Control (CDC), Environmental Protection Agency (EPA), and
American College of Occupational and Environmental Medicine
(ACOEM).


 B. On each and every patient herein, [Campbell] made medically and
scientifically unsupported findings of "toxigenic mold exposure." 
There is no scientific support, peer reviewed studies, or generally
accepted medical studies, literature or testing that has demonstrated a
causal connection between mold exposure and neurological and other
diseases as diagnosed by [Campbell]. 

 

 Although Campbell has published his opinions in several peer-reviewed publications,
Conn Appliances argued that "Dr. Campbell and the other medico-legal players on the junk
science side of the 'toxic mold' docket have created a self-serving 'cottage industry' to
publish a number of articles regarding mold and their own novel theories on mold-related
illnesses." Conn Appliances argued that these publications were collected by another doctor
whose "mold theories" are also contested in the medical field. Moreover, Campbell admitted
that he knew of no epidemiological studies or blind studies that relate mold exposure to
CIDP, and that he knows of no controlled studies that relate mold exposure to CIDP, besides
those he and his associates have authored. 

The Theory or Technique's Potential Rate of Error

 Conn Appliances contends that Campbell's diagnoses of mold-related illnesses in this
case have a high potential rate of error because they are based on: (1) mold cultures that are
insufficient evidence of exposure or causation, (2) immunoassay tests that lack scientific
validity and are no evidence of mold or mycotoxin exposure or causation, and (3) his own
"clinical" evaluation as opposed to direct testing such as chromatography or mass
spectrometry on blood or urine samples to determine exposure to mycotoxins. 

 Appellants contend Campbell's review of the literature on health effects associated
with exposure to mycotoxins demonstrates that there is some belief within the scientific
community that exposure to mycotoxins can cause such illnesses as diagnosed by him in this
case. Appellants also argue that Conn Appliances' own evidence suggests that research is
still ongoing and that the authorities Conn Appliances relies on agree that there is insufficient
evidence to date on the causal connection. 

The Theory or Technique's Non-Judicial Uses

 Conn Appliances maintains that because the vast majority of the relevant medical and
scientific communities reject Campbell's theory that mold mycotoxins can cause
autoimmune/neuropathic disorders, the only remaining use for Campbell's theories is in the
medico-legal arena. Conn Appliances also states that to the extent that there are non-judicial
uses for "the diagnostic theories of Dr. Campbell and his 'associates,' such uses pale beside
the medico-legal uses to which Dr. Campbell has put them." 

Our Review of the Trial Court's Order Excluding Campbell's Testimony

 While appellants contend the trial court exclusively relied on "'general acceptance'
rather than [on] other pertinent [Robinson] factors, such as non-judicial uses and/or
publication of theories in peer review scientific texts and/or journals" in excluding
Campbell's testimony, we disagree. Based on our review of the evidence and the record,
Conn Appliances presented evidence for each of the factors, and the trial court's order stated
the factors it relied on in excluding Campbell's testimony. We also note appellants'
arguments that research is still ongoing as to the causal connection between indoor exposure
to mycotoxins and autoimmune/neurologic illnesses. While we "should not foreclose the
possibility that advances in science may require reevaluation of what 'good science' is in
future cases," we are required to look to what is generally accepted in the current scientific
community. Havner, 953 S.W.2d at 720-21. We conclude that based on the evidence before
the trial court, the trial court did not abuse its discretion in finding Campbell's testimony
unreliable under Robinson and excluding his testimony. Issue one is overruled.

Summary Judgment

 Conn Appliances moved for summary judgment on both no evidence and traditional
grounds. See Tex. R. Civ. P. 166a(c),(I). We review a no evidence summary judgment under
the same standard as a directed verdict. King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 750-51 (Tex. 2003). Accordingly, we examine the record in the light most favorable to the non-movant, crediting evidence favorable to the non-movant if reasonable jurors could, and
disregarding contrary evidence unless reasonable jurors could not. See Mack Trucks, Inc. v.
Tamez, 206 S.W.3d 572, 582 (Tex. 2006). If the non-movant produces more than a scintilla
of probative evidence to raise a genuine issue of material fact, then summary judgment is
improper. Tex. R. Civ. P. 166a(I); King Ranch, Inc., 118 S.W.3d at 751. A party produces
more than a scintilla of evidence if the evidence allows reasonable and fair-minded people
to differ in their conclusions. 118 S.W.3d at 751 (citing Havner, 953 S.W.2d at 711). A
party produces less than a scintilla of evidence when the evidence is "so weak as to do no
more than create a mere surmise or suspicion" of fact. Id. (quoting Kindred v. Con/Chem,
Inc., 650 S.W.2d 61, 63 (Tex. 1983)). When, as here, a trial court's order granting summary
judgment does not specify the grounds relied upon, we affirm the summary judgment if any
of the summary judgment grounds is meritorious. FM Props. Operating Co. v. City of
Austin, 22 S.W.3d 868, 872-73 (Tex. 2000).

 Having held that the trial court properly excluded Campbell's testimony and
considering the trial court excluded any testimony and evidence related to ISL's
immunoassay tests, the appellants' only remaining offer of any proof of causation is the mold
culture report. Not only is the report no evidence that indoor exposure to mycotoxins cause
autoimmune/neurologic illnesses, but it also is no evidence of specific causation. See
Havner, 953 S.W.2d at 714-15. The report fails to show that appellants were actually
exposed to any mycotoxins in their house, what specific molds they may have been exposed
to inside the house, and the levels of mold in the house. Finding no evidence of an essential
element of appellants' claim, we overrule appellants' second issue. The trial court's final
summary judgment order is affirmed.

 AFFIRMED.

 __________________________________

 CHARLES KREGER

 Justice


Submitted on May 8, 2007

Opinion Delivered September 6, 2007



Before McKeithen, C.J., Kreger and Horton, JJ.
1. Dr. Campbell testified in an earlier deposition that he is board-certified in family
practice and in forensic medicine, but admitted he is not a board-certified immunologist,
toxicologist, neurologist, epidemiologist, or a hematologist/oncologist. 
2. At the hearing, Campbell's diagnoses of the appellants differed from his
diagnoses of the appellants in his prior deposition testimony. In his prior deposition, he
diagnosed Joseph, Joyce, and Audrey with three autoimmune/neuropathic disorders: (1)
chronic inflammatory demyelinating polyneuropathy (CIDP), (2) multifocal motor
neuropathy (MMN), and (3) paraproteinaemic demyelinating neuropathy (PDP). He
diagnosed Austen with an immune mechanism disorder called immune dysregulation and
Andrew with autoimmune disease, immune mechanism disorder, and mycosis. 
3. When testimony is not scientific but involves technical or other specialized
knowledge, the Robinson factors may not apply. Gammill v. Jack Williams Chevrolet,
Inc., 972 S.W.2d 713, 726 (Tex. 1998). Even under those circumstances, however, there
must be some basis for the opinion to show its reliability. Id. An expert's mere opinion
will not suffice. Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 
1997). There cannot be "'too great an analytical gap between the data and the opinion
proffered.'" Gammill, 972 S.W.2d at 726 (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136,
146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). 

4. The trial court granted in a separate order Conn Appliances' motion to exclude
testimony or evidence based on the ISL immunoassay tests.